UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN R. PERLES, P.C., )
)
  Plaintiff and Counterclaim Defendant, )
)
               v. ) C.A. No. 01-0105 (TPJ)
)
ANNE MARIE KAGY )
)
  Defendant, and Counterclaim and )
  Third-Party Plaintiff )
)
               v. )
)
STEVEN R. PERLES, Esq., )
)
  Third-Party Defendant )
)

FILED
APR 10 2003
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## DECISION AND ORDER

This is a diversity action upon an oral contract for payment for personal services, commenced preemptively by the alleged debtor for a declaratory judgment limiting his liability under the contract. The alleged creditor has counterclaimed for judgment on the contract in a liquidated amount, and in the alternative for a judgment in *quantum meruit* for the value of work she performed pursuant to the contract.[1]

Plaintiff-debtor is an attorney in private practice as a sole practitioner in the District of Columbia. Defendant and counterclaimant-creditor is a younger lawyer who lives in Virginia and has worked intermittently for the plaintiff for several years as an independent contractor. Plaintiff acknowledges his

---

[1] Steven R. Perles, Esq., although technically a third-party defendant, is the *alter ego* of plaintiff Steven R. Perles, P.C., for purposes of this case.

1

indebtedness to defendant/counter-claimant in some amount for services rendered, but disputes the amount she claims to be owing. The controversy arises upon plaintiff's receipt of payment of a substantial sum as a contingent fee in a novel case on which defendant/counter-claimant did substantial and valuable work.

The case in contract was tried to the Court sitting without a jury, January 21, 2003 to January 29, 2003.[2] The evidentiary record, from which the Court finds the facts set forth below pursuant to Fed. R. Civ. P. 52(a), consists almost entirely of the oral testimony of the parties, and such corroboration as is supplied by the oral testimony of the witnesses they called. Virtually none of the documentary evidence admitted proved to be material.

I.

Stephen Perles is a lawyer in private solo practice in the District of Columbia. He was admitted to the bar in 1975, worked as a staffer for a U.S. Senator for six years, primarily on international issues, and opened his law practice as Stephen R. Perles, P.C., in 1981 specializing in "designing international remedies" for his clients.

Anne Marie Lund Kagy entered George Mason University Law School in the fall of 1991, and while in law school worked for Perles as an intern/extern for academic credit. Upon graduation in 1994, she continued to work intermittently as a contract lawyer for him, but also took an LL.M. degree at American University in international law. In the spring of 1996 she approached Perles about the prospect of employment with him or as a reference for a job with a "major" law firm. Perles said he could not pay her a base salary, but agreed to be a reference for her, and until such time as she might

---

[2]The *quantum meruit* claim was severed for later trial, if necessary, at the outset of the case.

2

find a job elsewhere, offered to put her to work on such cases as he had, her compensation to be contingent, for the most part, as was his, upon receipt of a fee.

Kagy worked essentially full-time for Perles over the summer of 1996 while looking for a permanent position. Sometime in 1996 Perles told Kagy of an impending case he had not yet taken, or had just taken, known as the Flatow case, involving a wrongful death claim for the murder of a young American woman, Alisa Flatow, in Israel in April, 1995, by a suicide bomber who had been recruited and trained by the Palestine Islamic Jihad.[3] The plaintiff would be the young woman's father, Stephen Flatow, a New Jersey lawyer. The principal defendant, if suit were filed, would be the Islamic Republic of Iran on the theory that in committing its terrorist acts the Islamic Jihad acted as the agent of Iran and its Ministry of Information and Security ("MOIS"). Such a lawsuit was unprecedented in an American court, and until recently impossible. However, recent amendments to the U.S. Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611 ("FSIA") (in the enactment of which the efforts of Perles and his potential client, Stephen Flatow, had been instrumental) had abolished the sovereign immunity of foreign nations in U.S. courts to actions for personal injury to or death of American citizens caused by the terrorist acts of their agents.

Both Perles and Kagy were aware that obtaining a judgment against Iran in the Flatow case would be difficult, and satisfaction of a judgment still more so. Receipt of any fee was doubtful, and in any event likely to be years in the future. In the interim, however, Perles told Kagy that she could work

---

[3]Perles remembers speaking to her about the Flatow case when they first resumed their relationship when she finished graduate school in May, 1996. Kagy believes it was November or December before her first serious discussion with Perles about long-term employment, and specifically in relation to the Flatow case.

3

without compensation on the Flatow case on contingency, as he himself would do.[4]

Kagy and Perles, however, recall the manner in which her contingent compensation on the Flatow case would be calculated altogether differently. Kagy was unwilling to commit to remain with Perles indefinitely, without significant compensation, until the Flatow case actually produced a fee, if it ever did, in a quite distant future. Perles, on the other hand, was reluctant to engage her fully in the preparation and presentation of the case if she were to depart for another firm at a critical stage. Kagy asserts that Perles offered to pay her "up to" one-third of his net fee in Flatow if she stayed long enough to see the case through to the receipt of a fee. Perles denies making such an offer and, still anticipating her departure before Flatow had borne fruit, says he offered to pay her an unspecified "elevated" hourly rate for the time she put into it, instructing her to "keep track of her hours;" he would protect her share of any fee paid were she no longer working for him.[5]

Whatever the terms of her compensation, Kagy agreed to work for Perles on the Flatow case, and Perles agreed that she would do so, for which she would eventually be compensated fully, albeit contingent on payment of a fee to Perles himself. Both parties agree that there was an oral contract formed between Perles and Kagy for the latter to perform legal services on the Flatow case in the nature

---

[4]When not working on Flatow, Kagy could work (as she had been doing) on approximately a score of cases known as the "Holocaust cases" involving claims before the U.S. Foreign Claims Settlement Commission against the Federal Republic of Germany by Jewish American citizens forced into slave labor in Nazi concentration camps during World War II. Perles' fees in those cases were capped by statute at 10 percent of the relatively modest amounts awarded in those found by the Commission to be meritorious – about half– of which he paid Kagy one-third of the net, all told about $20,000 over three years.
    On the few cases Perles had for clients who paid regularly while the matter was in progress or by retainer, Perles paid Kagy $50 per hour for her work.

[5]Although never spoken aloud, Perles had in mind at the time an hourly rate "double or triple" the $50 per hour he paid her on non-contingent fee cases. (Tr. of 1/21/03, a.m., p.169).

of those of a salaried lawyer conventionally employed in a law firm. Both agree that Kagy performed those services, did so generally well–and sometimes brilliantly–and devoted essentially full time to doing so. Whether other employment was ever offered her, Kagy never took it.

Although the relationship persisted for a period of approximately three years, the terms of her engagement were never reduced to a mutually binding writing, in whole or any part.[6] Nor does any of the voluminous documentary material generated by the parties in discovery or preparation for trial provide material substantiation for either version.

In January, 1997, Perles engaged co-counsel for the Flatow case, Thomas Fortune Fay, Esq., a personal injury sole practitioner with substantial trial experience, who had assisted him the preceding summer in drafting amendments to the FSIA. Arrangements were concluded at a luncheon meeting on February 21, 1997, attended by Kagy as well as Perles and Fay. Fay would assist in developing the evidence to be presented to the court when Flatow came to trial, and would actually be trial counsel. Fay and Perles would split any fee received. When Kagy mentioned that she might find another job she was then told– for the first time, she says– that Perles and Fay would protect a share for her calculated at an "elevated" hourly rate. Perles and Fay remember no such conversation.

Kagy began drafting the formal Flatow complaint, which both Perles and Fay reviewed and

---

[6]In early March, 1997, Kagy drafted a letter to herself on Perles' stationery, on his computer, and for his signature, memorializing her understanding of their agreement, viz., compensation to her of one-third of Perles' net fee in Flatow, and left it in his office to sign. Perles said nothing about it for over a week, and when confronted about it, said it was "all wrong" without saying why, and refused to sign it.
   Kagy's unsigned written version of the agreement, repudiated by Perles as "all wrong," has disappeared, and the computer hard drive on which it was written has inexplicably been eradicated. Perles himself never attempted to reduce any version of the agreement to writing, although Kagy insists she repeatedly asked him to do so.

revised. The complaint, as filed in the U.S. District Court for the District of Columbia on February 26, 1997, was drawn in several counts making, in essence, claims which would be characterized in American legal terms as wrongful death and survival claims for damages to Alisa Flatow's estate, solatium for the next-of-kin, and a punitive damage claim against the Islamic Republic of Iran, MOIS, and various Iranian government officials. Kagy took responsibility for overseeing the complexities of effecting valid service of process on Iran. Perles and Fay assembled the evidence to prove the Iranian connection to the suicide bombing and the decedent's death, as well as the measure of damages recoverable. Their preparation entailed trips to Israel by both of them to locate, interview, and depose witnesses, and (with Stephen Flatow's assistance) overtures to high-ranking U.S. officials to obtain access to classified intelligence materials.[7]

Perles had expected Iran to interpose a vigorous and protracted defense to the case, as it had in numerous prior commercial lawsuits, and as Libya was even then doing in personal injury cases elsewhere involving victims of the bombing of Pan Am Flight 103 over Scotland. To everyone's astonishment, following service of process upon it in June, 1997, Iran and its co-defendants defaulted, and the case was set for *ex parte* proof before District Judge Royce C. Lamberth in early March, 1998.

Iran's default only marginally allayed Perles' anxiety about prosecuting the case to successful conclusion. Even if a judgment were entered, he anticipated a motion to set it aside under Fed. R. Civ.

---

[7]On March 3, 1997, Kagy confided in Perles that she had been diagnosed with a bipolar disorder, for which she was being medicated. Perles agreed that their relationship would continue so long as her condition remained under control.

Perles contends that her work thereafter was affected by the disease; specifically, during her depressive episodes she was unproductive and unresponsive for periods of several days, and time ostensibly chargeable to the Flatow case should be disregarded. The issue is irrelevant to the disposition the Court makes of the case.

P. 60(b), an appeal, or a collateral attack on future enforcement proceedings. Consequently he and Fay assembled overwhelming evidence of Iran's culpability for the suicide bombing and the decedent's death, in conjunction with which Perles had Kagy research and write a comprehensive memorandum of law analyzing and refuting every conceivable defense a defiant Iran might have raised had it determined to oppose the claim.

Following a two-day evidentiary hearing before Judge Lamberth, March 2-3, 1998, upon proposed findings of fact and conclusions of law drafted in large part by Kagy and tendered to the court, on March 11, 1998, Judge Lamberth entered judgment for the plaintiff in Flatow against the Iranian defendants aggregating over $22.5 million in compensatory damages and $225 million in punitive damages. See, generally, Flatow v. Islamic Republic of Iran, 999 F. Supp. 1 (D.D.C. 1998).

As matters came to pass, Iran never moved to set aside the judgment nor appealed it, nor did it mount a collateral attack on subsequent efforts by Perles and Fay to enforce the judgment by attaching Iranian assets in the United States. Ironically, such resistance as they encountered came from the U.S. government, in whose custody or possession most Iranian assets in the United States were to be found.

Perles and his client, Stephen Flatow, returned to Capitol Hill and joined forces with lawyers for victims of Iranian-supported terrorists in other cases to obtain legislation authorizing payment of judgments in their favor from U.S.-held Iranian funds. Once again Kagy played no part in the lobbying efforts, which were rewarded in October, 2000, by the enactment of legislation directing the payment of the compensatory-damage portion of certain FSIA judgments against Iran, including Flatow, from the U.S. Treasury, which the United States could then recoup from Iranian credits with the Department of Defense representing overpayments for military equipment. In January, 2001, the U.S. Treasury disbursed approximately $23 million to Stephen R. Perles, P.C. in satisfaction of the Flatow judgment

for compensatory damages, presumably entitling Perles to a net fee of roughly $7 million, to be shared 50-50 with Thomas Fortune Fay.

In the meantime, Kagy had departed physically from the offices of Perles, P.C.– he says in February 1999; she says the following October– although she continued to do contract work for him at $50 per hour from her home or elsewhere. She has, to date, been paid nothing for her work on the Flatow case, although Perles has placed a portion of his fee in escrow with his current counsel from which she will be paid the amount she is adjudged entitled to receive.

II

The Court finds, by a preponderance of the evidence, that the oral contract between Perles and Kagy contemplated a payment to Kagy for her services on the Flatow case of a one-third percentage of the net fee retained by Perles, and not an "elevated" hourly rate. The Court credits Kagy's testimony in that regard, because it is supported by substantial corroborating evidence, both direct and circumstantial, while Perles' testimony is without substantial independent corroboration and is, in fact, contradicted by a judicial admission, found at Paragraph 20 of his complaint for a declaratory judgment, that he had offered her a "percentage" compensation.

The Court deems it significant that, notwithstanding Perles' alleged instruction to Kagy when the terms of her engagement were first discussed to "keep track of her hours" so she could be paid at an "elevated" hourly rate on the Flatow case, she never did, although she was meticulous in doing so in other cases in which it was clearly understood she was being paid by the hour. (Tr. of 1/24/03, a.m., pp. 77-90; compare pp.90-96). Perles has never asked her for her time records in Flatow. (Tr. of 1/22/03, p.m., p.27).

Kagy testified that she received a telephone call from Perles while she was recuperating from the

8

flu at home in early May, 1997, in which she asked that her share of fees in the "Holocaust cases" be increased to 50 percent. Perles refused, and in the heated conversation that followed, the subject of the Flatow case came up. Kagy testified that Perles told her that a one-third share of his net fee would "always be appropriate" in his contingent-fee cases, including Flatow, and that she would then be in "very good shape" when that fee was received. (Tr. of 1/24/03, a.m., pp.67-75).[8]

Kagy's recollection is corroborated by the testimony of two neutral witnesses– self-described as "friends" of, and on a first-name basis with both Perles and Kagy– as to at least two contemporaneous express or implied admissions by Perles that Kagy's compensation in Flatow would be a percentage of his fee. The evidence established that during the relevant period– 1996 to 1999– the offices of Perles, P.C., at 1666 Connecticut Avenue, N.W., shared space on a single floor with two other small law firms. Personnel from all three firms worked in close proximity and mingled informally with one another, and were audibly privy to much of one another's discourse not conducted strictly in private. Kagy's frustration at working for nothing and being unable to get Perles to commit to a fee agreement in writing was common knowledge throughout the office, including the incident in early March, 1997, when Kagy drafted a compensation agreement for herself for Perles' signature that he denounced as "all wrong" and refused to sign, but would not tell her why. See supra note 4.

About a month following Kagy's May, 1997, telephone conversation with Perles, Jonathan Ambush, a University of Maryland law student who clerked for Perles during the summers of 1996 and 1997, overheard an altercation between Kagy and Perles he places sometime in June of 1997, following

---

[8]Perles does not remember a telephone conversation in May, 1997, at all, and believes Kagy's first request for a 50-50 split in the "Holocaust cases" – which he peremptorily refused– occurred in a face-to-face encounter with Kagy in fall of 1997. (Tr. of 1/21/03, a.m., p.177).

which Kagy fled from the office. The subject was, once again, Kagy's frustration at not having a written fee agreement in place. According to Ambush, Perles explained to him that Kagy wanted a partnership, which was "unrealistic." Moreover, he was, Perles told Ambush, already "expecting to give her a percentage" in the Flatow case. (Tr. of 1/23/03, a.m., pp.71-72).

A year later a Georgetown student clerking for another firm with offices at 1666 Connecticut Avenue, Kristen Hughes, remembers a conversation with Perles sometime in the summer following Judge Lamberth's decision in March, 1998. Aware generally of the tension between Perles and Kagy, she urged Perles to be more considerate of her and was told by Perles not to be concerned about her: that Kagy would "never have to work again...she'll be a millionaire." (Tr. of 1/24/03, a.m., p.13). She also distinctly recalls Perles himself telling her at some time that Kagy was working for a "percentage." (Id. at 14-15).

Both Perles and Fay estimate the fair market value of Kagy's work on the Flatow case at between $75,000 and $125,000 at her "normal" rate of $50 per hour. (Tr. of 1/22/03, p.m., p.29; Tr. of 1/21/03, a.m., p.79). Trebled, i.e., the highest "elevated" hourly rate ever contemplated by Perles for Kagy, she would have received at most $375,000, an amount insufficient either to make her a "millionaire" or enable her to retire for life.

The Court credits Kagy's testimony with respect to that telephone conversation in May–at least its substance– and finds that it constituted either an admission by Perles that their agreement *ab initio* called for her to receive a percentage of his fee in Flatow, or, alternatively, that it represented an oral addendum or amendment to that effect to any contrary agreement as he remembered it.[9]

---

[9] The Court also finds, however, that the agreement to pay Kagy a percentage fee in Flatow did not encompass an understanding to pay her a similar fee in a subsequent case known as Eisenfeld and Duker with which she had some early minimal contact.

III.

The parties agree that this case is to be decided under District of Columbia law. The D.C. Court of Appeals has enforced oral contracts such as that alleged by Kagy here when the facts clearly establish an express agreement as to all material terms by a preponderance of the evidence. See <u>Emerine v. Yancey</u>, 680 A.2d 1380 (D.C. 1996); <u>Vereen v. Clayborne</u>, 623 A.2d 1190 (D.C. 1993). See also <u>Restatement (Second) of Contracts</u>, §§ 22, 34 (1981). The case raises no issues of law.

Thus, having found that the defendant/counterclaimant/third-party plaintiff Anne Marie Kagy is entitled to judgment on her counterclaim against plaintiff and counter-defendant Stephen R. Perles, P.C., and on her third-party complaint against third-party defendant Stephen R. Perles, Esq., in the amount of one-third of any net fee paid to Stephen R. Perles, P.C., in the case of <u>Flatow v. The Islamic Republic of Iran, et al.</u>, it is, by the Court, this 10th day of April, 2003,

ORDERED, that this case is referred to Magistrate Judge Alan Kay for a determination of the amount of the net fee or fees paid to Stephen R. Perles, P.C., in the <u>Flatow</u> case aforesaid in consequence of the judgment for compensatory damages entered by Judge Lamberth on March 11, 1998; and it is

FURTHER ORDERED, that upon such determinations the Court will order entry of final judgment in accordance herewith; and it is

FURTHER ORDERED, that the claim in *quantum meruit* is dismissed as moot.

_____
Thomas Penfield Jackson
U.S. District Judge

11