**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Steven R. Perles, P.C., et al.     )
                                         )
      Plaintiff/Counter-Defendant,  )
                                         )
v.                                   )     Case Number: 1: 01CV00105 (TPJ)(AK)
                                       )
Anne-Marie Lund Kagy, Esq.    )
                                       )
      Defendant/Counter-Plaintiff  )
                                       )
v.                                   )
                                       )
Steven R. Perles, Esq.         )
                                       )
      Third-Party Defendant.    )
_____)

## PRE-TRIAL BRIEF OF DEFENDANT AND COUNTER-CLAIM PLAINTIFF ANNE-MARIE LUND KAGY

      Comes now the Defendant and Counter-Claim Plaintiff Anne-Marie Lund Kagy and for her Trial Brief on her Counterclaims for Count II, Breach of Implied Contract, and Count III, Quasi Contract, Unjust Enrichment, states as follows:

### Procedural History

      This case involves a dispute over the compensation for services that Anne-Marie Lund Kagy ("Ms. Kagy") provided to Steven R. Perles, Esq., and Steven R. Perles P.C. ("Mr. Perles") from 1996 to 2000 in the cases of Flatow v. The Islamic Republic of Iran, et al, 999 F. Supp. 1 (D.D.C. 1998), et. seq., 97-cv-396, and Eisenfeld and Duker v. Islamic Republic of Iran, 172 F. Supp. 2d 1 (D.D.C. 2000), 98-cv-1945.  Mr. Perles initiated this lawsuit by filing a Complaint seeking a declaratory judgment stating that any claim for fees by Ms. Kagy sounds in contract, and that under the contract terms, Ms.

Kagy was to be paid an hourly fee for her properly documented and substantiated time. Complaint at p.1 ¶ 4. Ms. Kagy filed a counterclaim for breach of contract, contending that the parties formed an oral agreement under which she was to receive one-third of Mr. Perles's net fee upon recovery in the <u>Flatow</u> and <u>Eisenfeld and Duker</u> cases. Kagy Counterclaim. In the alternative, Ms. Kagy filed claims for breach of contract implied-in-fact and quasi-contract (unjust enrichment), claiming recovery under a *quantum meruit* theory. <u>Id.</u>

The Honorable Judge Thomas Penfield Jackson heard evidence on Mr. Perles's claims in a bench trial beginning on January 21, 2003.  On January 24, 2003, Judge Jackson severed Ms. Kagy's counterclaims, and took evidence only on her "express" contract claim during the remainder of the trial. Trial Transcripts of January 24 [hereinafter: Jan. 24 Tr. p. ____] p. 5 lns. 20-25.   At the close of the evidence on Ms. Kagy's contract claim, Judge Jackson limited the parties' Proposed Findings of Fact and Conclusions of Law to "the express contract case." Jan. 28 (p.m.) Tr. p. 74 ln. 20, p. 76 ln. 8.[1]

On April 10, 2003, following oral argument and the submissions of written proposed  Findings of Fact and Conclusions of Law by both parties, the Honorable Judge Thomas Penfield Jackson entered a Decision and Order pursuant to Rule 52 of the Federal Rules of Civil Procedure. The Court found that the parties had formed an oral

---

[1] Mr. Perles admitted in his Findings of Fact and Conclusions of Law that the evidence failed to establish his version of a contingent hourly contract as there was no meeting of the minds on the essential terms. Proposed Findings of Fact and Conclusions of Law of Plaintiff and Counterclaim-Defendant Steven R. Perles, P.C., and Third-Party Defendant Steven R. Perles, Esq. p. 21 ¶ 2(b).  By his own testimony, he never communicated to Ms. Kagy the essential terms of the contract he alleged in his Complaint. Jan. 23 Tr. p. 55 ln. 1 – p. 56 ln. 21.

contract for one-third of Mr. Perles's net fee in the <u>Flatow</u> case, and referred the matter to

the Honorable Magistrate Judge Alan Kay for a determination of the amount of Mr.

Perles's "net fee." April 10, 2003 Order p. 11. The Court did not award Ms. Kagy any

compensation for her work on the <u>Eisenfeld and Duker</u> case. In a footnote, the Court

described her work on this case as "minimal," and in the Order dismissed the *quantum*

*meruit* claims as moot. April 10, 2003 Order n. 9, p. 11.

On May 30, 2003, counsel for Ms. Kagy filed a Motion to Amend Decision and

Order of April 10, 2003. In response, Judge Jackson vacated the provision of the April

10, 2003, Decision and Order that dismissed Ms. Kagy's claim in *quantum meruit* as

moot. Order dated July 10, 2003. On August 22, 2003, Ms. Kagy's claims for fees from

the <u>Eisenfeld and Duker</u> case were referred to Magistrate Judge Kay for a ruling on the

"issue of quantum meruit," as well as Mr. Perles's previously filed Motion in Limine. At

the Evidentiary Hearing scheduled for December 16, 17, and 18, 2003, the Court will be

asked to consider the following issues: 1). Whether Ms. Kagy is entitled to one-third of

Mr. Perles's net fee in <u>Eisenfeld and Duker</u> under an implied-in-fact contract; 2).

Whether Ms. Kagy is entitled to the *quantum meruit* value of her services based on the

degree to which Mr. Perles was unjustly enriched by her services; and whether the

reasonable value of her services should be calculated based on a percentage of the fund or

on the lodestar method; 3). Whether Robert Condon can give expert testimony on the

reasonable value of Ms. Kagy's services; 4).Whether Ms. Kagy can give testimony on the

reasonable value of her services; 5). How to determine Mr. Perles's net fee in the <u>Flatow</u>

case; 6). Whether Ms. Kagy is entitled to prejudgment interest dating from January 17,

2001, the date Mr. Perles's share of attorneys fees was transferred from the client trust accounts to Mr. Perles.

## Summary of the Facts.

Much of the basic facts and background of this case are outlined in Judge Jackson's Decision and Order dated April 10, 2003.  The trial testimony of Mr. Perles and co-counsel Thomas Fay establish the significant role Ms. Kagy played in bringing the Flatow case to judgment and collection. Flatow was among the first cases filed under the amended Foreign Sovereign Immunities Act, 28 U.S.C.A. § 1605(a)(7) that permitted private suits against foreign state sponsors of terrorism. Mr. Perles acknowledges that Ms. Kagy interviewed the clients and developed the fact pattern for the Flatow complaint; (Jan. 21 Tr. p. 153, lns. 13 to 18); that she worked on effecting service on the Iranian government and other Defendants; (Jan. 21 Tr. p. 157 ln. 21- p. 158 ln. 10); and that after her Ex Parte Motion for Entry of Default was granted,she prepared and filed an Ex Parte Brief on Dispositive Issues of Law (and described this as one of her better pieces of work). Jan. 21, p. 159 lns. 19- p. 160 ln.12, p. 175 lns. 17 – p. 176 ln. 5. Ms. Kagy will testify that after entry of the default judgment in Flatow, she began working on collection and enforcement efforts, in tandem with intensive lobbying for further amendments to the FSIA's enforcement provisions. This work directly benefited both Flatow and Eisenfeld and Duker, and many other cases.

Mr. Perles acknowledged at trial the extensive similarities between, and the contingent nature of, the two cases when he described how Ms. Kagy drafted the Eisenfeld and Duker complaint. Jan. 29 Tr. p. 15 lns. 13-25.  Mr. Perles authorized Ms. Kagy to interview the two families during her Christmas vacation to develop the fact

pattern for the complaint. Jan. 29 Tr. p. 15 lns 18-25. Mr. Perles told the Court that Ms.

Kagy  then "started plugging" the Eisenfeld and Duker fact pattern into the Flatow

"template." Jan. 29 Tr. p. 15 lns 18-25.    In fact, Mr. Perles eventually filed a motion to

consolidate the enforcement effort in the two cases. In arguing in support of the motion,

Mr. Perles stated in reference to the Flatow and Eisenfeld and Duker cases that:

"questions of law would be identical to all parties." Plaintiff's Motion to Consolidate

filed April 6, 2001, as Item 42 in Eisenfeld and Duker v. Islamic Republic of Iran, 98-cv-

1945 DDC (RCL).  The record of the case also establishes that, for purposes of

disbursement, enforcement costs were apportioned among the three plaintiff families in

the two cases, resulting in a joint disbursement sheet for the $53,982,596.31 joint

recovery. See Exhibit P.  Indeed, the disbursement sheet shows that the parties shared on

a pro-rata basis the actual costs of litigation.  Mr. Perles testified before Judge Jackson

that Exhibit P accurately reflects the disbursement of funds in the two cases. Jan. 23 Tr.

p. 8 lns 4-11.

        All of these enforcement actions and most of the lobbying efforts were made in

the name of Flatow because the judgment in Eisenfeld and Duker did not issue until July

11, 2000. It is indisputable that Eisenfeld and Duker benefited from these actions and

efforts. Although Eisenfeld and Duker was barely ripe to file its first writ of execution,

those families were able to apply for, and in fact received their payments, in conjunction

with the Flatow family.

        As a member of the litigation team in both cases, Ms. Kagy will testify as to her

specific contributions to the Flatow case that carried over to the Eisenfeld and Duker

case,  which included the following:

1).     Identified and resolved a statutory interpretation defect that could have barred the <u>Flatow</u> and <u>Eisenfeld and Duker</u> claims.

2).     Identified and resolved procedural issues for service of process, collection of evidence in Israel and the economical presentation of testimony by numerous foreign witnesses.

3).     Reviewed the draft of the proposed <u>Flatow</u> Amendment, codified at 28 U.S.C.A. § 1605 note, for effectiveness, performed the research and formulated the arguments that persuaded the Court to create a federal common law of solatium damages resulting from acts of state-sponsored terrorism.  These solatium claims generated approximately 85 percent of the compensatory damages award to the Flatow, Eisenfeld and Duker families.

4).     Alerted the Court to a procedural anomaly she had discovered in law school that foreign state defendants exploited through collateral attacks on default judgments, and proposed an approach to minimize its impact.

5).     Assisted in the selection of appropriate enforcement targets by sharing her pre-existing knowledge regarding the enforcement of judgments overseas,  by researching pending claims against the Iranian government, and by identifying the source of funds from which recovery was ultimately achieved.

6).     Performed almost all research and substantive briefing for enforcement actions against Iranian assets under the protection of the United States Government and against alleged Iranian assets under the control of third parties until Mr. Perles initiated suit against her.

7).     In consultation with other plaintiffs' counsel, helped formulate remedial

legislation for the FSIA's enforcement provisions and prepared extensive materials in

support of lobbying efforts in support of two rounds of proposed amendments.

Ms. Kagy will testify that having completed most of the heavy lifting of legal

interpretation and argument through Flatow and its enforcement actions, there was no

need for either Ms. Kagy or Mr. Perles to devote anywhere near that level of effort in

order to succeed in Eisenfeld and Duker. The primary differences between the two cases

were factual, and thus the burden fell disproportionately upon trial counsel, Mr. Fay,

whose obligation it was to prepare for and conduct the damages hearing.  Mr. Perles, in

fact, testified that trial in the two cases were similar. Jan. 22 Tr. p.8 lns 24- p. 9, ln. 4.

Ms. Kagy will also testify as to the specific contributions she made directly to the

Eisenfeld and Duker case, including the following:

1).     Developed the initial client contacts  on behalf of Steven R. Perles, P.C.

into a relationship of trust and confidence during the course of a detailed factual

interview with the clients that she conducted alone in the Eisenfeld's home on December

26, 1997.

2).     Persuaded Mr. Perles not to drop the Eisenfeld and Duker families as

clients in order to focus exclusively on Flatow.

3).     Was primarily responsible for drafting the Complaint.

5).     Effectuated Service of Process, including several status reports to the

Court during its pendency.

5).     Drafted the Motion for Entry of Default.

6).     Discussed the form and scope of the Proposed Findings of Fact and Conclusions of Law with Mr. Fay.

7).     Prepared lobbying materials specific to Eisenfeld and Duker for the Connecticut and New Jersey Congressional delegations.

 Mr. Perles states Ms. Kagy effectively terminated her contract.  This is specifically denied by Ms. Kagy.  Further, while Ms. Kagy was working on Flatow and Eisenfeld and Duker, she was also working on some 20 Holocaust claims on a one-third contingency basis. Four of those claims did not come into the office until after the May 1997 conversation in which she and Mr. Perles agreed she was to receive one-third of his recovery in these cases. [2]   Mr. Perles recovered a fee in two of these cases, and Ms. Kagy was paid one-third of his fee with no further discussion.  It was implied that the same agreement that they had formed for the first 16 Holocaust cases also applied to any new cases she might work on. Ms. Kagy will testify that as she began to work on Eisenfeld and Duker in December 1997, she had one brief conversation with Mr. Perles as to her compensation for this case, during which it was agreed that it would be the same deal as they had in Flatow. Deposition of Anne-Marie Kagy, April 22, 2002. Tr. p. 123 lns 2-17. As in the Flatow case, Mr. Perles never agreed to put this agreement into writing.  He acknowledged, however, in his Complaint that Ms. Kagy's  compensation in Eisenfeld and Duker was "under a fee basis that was the same as in Flatow."  Complaint ¶ 21.

_____

[2] Judge Jackson found that this May conversation either established the terms of their contingency agreement, or that it constituted an oral amendment to any existing agreement that Mr. Perles had previously recollected differently. April 10, 2003, Order p. 10.

The Court may note there is yet another similarity between the two cases.   Just as in <u>Flatow</u>, Ms. Kagy did not keep contemporaneous records of her time from the inception of the <u>Eisenfeld and Duker</u> case.  In ruling that Ms. Kagy was entitled to one-third of Mr. Perles's fee in the <u>Flatow</u> case, Judge Jackson gave weight to the fact that while she kept meticulous records in her hourly cases, she had limited records of her time in <u>Flatow</u>. April 10, 2003 Order p. 8.  Judge Jackson also noted that Mr. Perles never asked Ms. Kagy for her hours in <u>Flatow</u>. <u>Id</u>   It is not coincidental that Ms. Kagy's contemporaneous time records are equally as limited in <u>Eisenfeld and Duker,</u> and that Mr. Perles never requested her hours in this case either. Jan. 22 (p.m.) Tr. p. 27.

Ms. Kagy also performed hundreds of hours of administrative tasks including errand running, opening the mail, answering the phones, business development, and work on other uncompensated matters in the office. Her reconstructed time records, which are incomplete, indicate a minimum of 660 uncompensated hours. She labored with the understanding that she would be receiving one-third of his fee in both <u>Flatow</u> and <u>Eisenfeld and Duker.</u>   Mr. Perles considered Ms. Kagy  to be an independent contractor, and the parties had an explicit understanding that she had no set hours, could come and go as she wished, and could work from other locations if she wished.  Jan. 23 Tr. p. 55 lns 9-10. In keeping with that understanding, beginning in October 1999 she began working primarily from her own office in Clarendon, at times from Mr. Fay's office, and occasionally returning to work in Mr. Perles's office as well.  She continued working on <u>Flatow</u> and <u>Eisenfeld and Duker</u> from these locations into the year 2000. One of her last reconstructed time entries for both cases was a telephone call on  Friday, April 28, 2000,

with Vicki Eisenfeld to discuss what Mrs. Eisenfeld should wear to trial the following

Monday. Exhibit H-1, p. 150.

## ARGUMENT

### I.     The Evidence Will Show The Parties Had an Implied-in-Fact Contract In Which Mr. Perles Agreed to Pay Ms. Kagy One-Third of His Fee in Eisenfeld and Duker

In bifurcating the trial, and entering his April 10, 2003, order Judge Jackson

addressed Ms. Kagy's express contract claim only. Jan. 24 Tr. p. 5, lns. 20-22. Judge

Jackson limited Ms. Kagy's testimony and evidence to her express contract claim and

limited the parties' Proposed Findings of Fact and Conclusions of Law to "the express

contract case." Jan. 24 Tr. p. 5., lns. 20-22, Jan. 28 (p.m.) Tr. p. 74 lns. 20-23, p. 75 lns

10-12; p. 76 lns. 6-8.   Although Judge Jackson initially dismissed her *quantum meruit*

claims as moot, his order on July 10, 2003, vacated this finding. Order dated July 10,

2003 p. 2. His order dated August 22, 2003, referred the case to Judge Kay for a ruling on

Ms. Kagy's "*quantum meruit* claims." August 22, 2003 Order p. 1.

In her counter-claim, Ms. Kagy put forth two claims for *quantum meruit* recovery:

a claim in contract implied-in-fact and a claim in unjust enrichment/quasi-contract.   An

implied-in-fact contract is a true contract in which the terms are not expressed verbally,

but are implied by the conduct and performance of the parties.[3] Ermine v. Yancy, 680

---

[3] The term "*quantum meruit*" is a theory of recovery that encompasses both implied-in-fact-contracts and implied-in-law contracts. The Fred Ezra Company v Pedas, 682 A.2d 173, 176 (D.C. 1996).  An implied-in-law contract, also called a quasi-contract, is not a contract, but a duty that the court recognizes to avoid one party's unjust enrichment. Id. at 175, quoting, Emerine v. Yancey, 680 A.2d 1380, 1383 (D.C. 1996). However, the term "*quantum meruit*" is also used interchangeably with unjust enrichment to describe a quasi-contract claim. Fred Ezra, 682 A.2d at 175, quoting E. Allen Farnsworth, Farnsworth on Contracts § 2.20 (1990).

A.2d 1380, 1383 (D.C. 1996).   The record has, in fact, established the four elements

required for a contract implied-in-fact. Those elements are:

> (1) valuable services being rendered; (2) for the person sought to be
> charged (3) used and enjoyed by him or her and (4) under such
> circumstances as reasonably notified the person sought to be charged that
> the [person  rendering the services] expected to be paid by him or her.

Vereen and Tech. Data Data Serv. v. Clayborne, 623 A.2d 1190, 1193 (D.C. 1993).

Judge Alan Kay noted in his Memorandum Opinion dated January 2, 2003, both

parties have pled the existence of a contract. See Memorandum Opinion dated January 2,

2003, p. 2, citing, Plaintiff's Complaint pp. 11-12, and Answer, Counter-Claim and Third

Party Complaint pp. 25-29.   Further, Mr. Perles acknowledged in his Complaint that he

has a contractual obligation to pay Ms. Kagy for her work in "Flatow and related cases."

Plaintiff's Complaint ¶ 53.   In Paragraph 20 of his Complaint, Mr. Perles admitted to

offering Ms. Kagy a percentage fee in the Flatow case. Plaintiff's Complaint ¶ 20. In

paragraph 21 of his Complaint, Mr. Perles admits that his fee agreement with Ms. Kagy

in the Eisenfeld and Duker case was the same as their agreement in Flatow. Plaintiff's

Complaint ¶ 21.

Although Judge Jackson found that the parties did not hold an oral contract for

payment to Ms. Kagy for her services on Eisenfeld and Duker, (Order dated July 10,

2003) the record demonstrates that Mr. Perles is obligated to pay Ms. Kagy on an

implied-in-fact contract.   The only unanswered question is what amount the Court can

infer is owed to Ms. Kagy based on the parties' course of conduct, course of

performance, and course of dealings. The customary fee that the complaining party

received under past agreements for similar services can provide the rate of compensation

for an implied-in-fact contract. See, e.g., Ermine, 680 A.2d at 1384; Sastry v. Coale, 585

A.2d 1324, 1329 (D.C. 1991); <u>Shalom Barnes Associates v. 900 F. Street Corp.,</u> 940 F. Supp. 1, 6 (D.D.C.1996). Ms. Kagy will testify that she and Mr. Perles had a five-year history of working together on approximately 24 contingency cases, and that her fee for each recovery was one-third of Mr. Perles's net fee. This course of conduct applied to <u>Flatow</u> case, to the <u>Nygaard-Huff</u> personal injury case, and to the nine Holocaust claims in which Mr. Perles recovered a fee.

It is especially significant that two of these successful Holocaust claims came into the office several months after the March to May 1997 conversations forming the parties' agreement that Mr. Perles would pay Ms. Kagy one-third of his recovery for these claims. Without discussion, Mr. Perles honored this same fee-splitting agreement and paid her one-third of his fee for the two cases that proved successful. Judge Jackson found that the Kagy-Perles contract for one-third of the <u>Flatow</u> recovery was forged during these same May-March 1997 conversations, but found that this express oral agreement did not extend to the <u>Eisenfeld and Duker</u> case because Mr. Perles's firm had not been retained as counsel in the case at that time. July 10, 2003 Order pp. 1-2. However, the course of conduct and course of performance of the parties established that there was an understanding, whether verbalized or not, that Ms. Kagy would be paid one-third of Mr. Perles's net fee in all contingency cases.

By accepting Ms. Kagy's performance on the <u>Eisenfeld and Duker</u> case, with the knowledge that Ms. Kagy believed she was earning one-third of his recovery, Mr. Perles manifested mutual assent to this contract term in <u>Eisenfeld and Duker</u>. Rest. 2nd Cont. § 20(2)(a)(b) and Comment b. A party is bound to a contract even if he creates an unintended appearance of assent through intentional conduct, and he knows the

appearance created by his conduct. Rest. 2nd Cont. § 23(a)(b).     Mr. Perles's brief discussion with Ms. Kagy on or about December 1997 about her joining him in the <u>Eisenfeld and Duker</u> case under the same arrangement as the <u>Flatow</u> case left Ms. Kagy with the understanding that she would be paid one-third of his fee in <u>Eisenfeld and Duker.</u> Mr. Perles's contemporaneous and subsequent statements that she would be "set for life" once the judgments were enforced similarly led her to believe that she would receive substantial fees for her work on both <u>Flatow</u> and <u>Eisenfeld and Duker</u>. Further, Mr. Perles admitted in his Complaint that the fee agreement he held with Ms. Kagy in <u>Eisenfeld and Duker</u> was the same as their fee agreement in <u>Flatow.</u> Complaint ¶ 21.

For the above-mentioned reasons, the Court should find that the parties had an implied-in-fact contract for one-third of Mr. Perles's fee in the <u>Eisenfeld and Duker</u> case.

## II.     Mr. Perles Owes Ms. Kagy  Compensation Equal to the Degree to Which He was Unjustly Enriched by Her Contributions to the Case.

In the alternative to her claim for one-third of Mr. Perles's fee under an implied-in-fact contract, Mr. Perles owes her the *quantum meruit* value of her services under a quasi-contract/unjust enrichment theory, which she alleges to be one-third of his fee.  A party is entitled to *quantum meruit* compensation or unjust enrichment if she can show the four elements of an implied-in-fact contract and a fifth element: that "a person retains a benefit . . . which in justice and equity belong to another." <u>U.S. ex Rel. Modern Electric v. Ideal Electronic Security,</u> 81 F. 3d 240, 247 (D.C. Cir. 1996), <u>citing, 4934 Inc. v. District of Columbia Dep't of Employment Servs.,</u> 605 A.2d 50, 55 (D.C. 1992).  Mr. Perles raises no argument refuting Ms. Kagy's entitlement to compensation under a theory of unjust enrichment, and, in fact, cannot raise such an argument given that he previously admitted that he is obligated to pay Ms. Kagy for her work on both <u>Flatow</u>

and Eisenfeld and Duker. Plaintiff's Complaint ¶ 53.  Instead, Mr. Perles argues that Ms. Kagy is not entitled to recover under the theory of unjust enrichment because, he claims, she has not articulated a reasonable hourly rate for her services and therefore cannot prove the market value of her services.[4] Supplemental Memorandum of Points and Authorities In Support of the Motion *In Limine* of Plaintiff and Counterclaim-Defendant Steven R. Perles, P.C., and Third-Party Defendant Steven R. Perles, Esq. p. 7.

The Court need only find some reasonable basis for computing Ms. Kagy's fee under a theory of unjust enrichment. TVL Associates v. A & M Const., 474 A.2d 156 (D.C. App. 1984).  The most obvious evidence of the reasonable market value of her services is the one-third contingency fee arrangement she held with Mr. Perles in Flatow, as well as all the other contingency contracts she held with Mr. Perles. See Moschetta v. Cross, 241 F. Supp. 347, 350 (D.D.C. 1964), aff'd sub nom, Ratner v. Bakery and Confectionary Workers, Int'l Union of America, 354 F.2d 504 (D.C. Cir. 1965) (rate of compensation in prior retainer agreement evidence of reasonable value of attorneys' services); Frederick County Fruit Growers Association Inc. v. Martin, 968 F. 2d 1265, 1272 (D.C. Cir 1992) (reasonable wage term implied in previous contract).

Mr. Perles also asserts without citation that "The Court has repeatedly held that *quantum meruit* damages cannot be computed on the basis of a percentage of the outcome of the case." Supplemental Memorandum of Points and Authorities In Support of the

---

[4] Mr. Perles does not articulate what methodology he would prefer the court use to determine the reasonable value of Ms. Kagy's services.  In addition to the percentage of the fund, or value-added approach, the Courts have recognized the so-called lodestar method, in which the Court evaluates an attorney's work based on twelve factors. Ginberg v. Tauber, 678 A.2d 543, 551-52 (D.C. App. 1996). This method has been criticized in recent cases as being too complicated and not in the interests of judicial economy. See generally, In re: Thirteen Appeals Arising Out of the San Juan DuPont Plaza Hotel Fire Litigation, 56 F. 2d 295 (1st Cir. 1995).

Motion *In Limine* of Plaintiff and Counterclaim-Defendant Steven R. Perles, P.C., and Third-Party Defendant Steven R. Perles, Esq. p. 7. Mr. Perles ignores an overriding factor in an unjust enrichment case, i.e.: that one party retains a benefit to the detriment of the other party.   The most reasonable measure of the actual value of the services is a percentage of the overall benefit from the services.   Moschetta v. Cross, 241 F. Supp. 347 (D.D.C. 1964), aff'd sub nom, Ratner v. Bakery and Confectionary Workers, Int'l Union of America, 354 F.2d 504 (D.C. Cir. 1965).   In Moschetta, this Court applied a percentage of the value analysis in awarding attorneys fees on a *quantum meruit* basis. The Court calculated the fees due to an attorney who had represented a Union and determined that a percentage of the annual dues was the best available measure of the reasonable value of his services in restoring the previously disreputable Union to a reputable status. Id. at 350-51.   In that case, the Court determined that twelve and one-half percent (12 1/2 %) percent of the Union members' annual dues was the reasonable value. Moschetta, 241 F. Supp. At 351.

This value-added or percentage of the fund method of calculating attorneys' fees has been cited with approval in District of Columbia courts as the most appropriate and fair way to apportion fees to attorneys whose contributions helped earn a common fund. Swedish Hospital Corp. v. Shalala, 1 F. 3d 1261 (D.C. Cir. 1993); See also, Central R.R. & Banking Co. of Georgia v. Pettus, 113 U.S. 116, 126-27, 5 S. Ct. 387 (1885).   This Court has noted its approval of dividing fees on this basis when there is successive litigation involving the same issues, and the later litigation "piggybacks" on the first, thereby reducing the risk of no recovery in the second litigation. Swedish Hospital, 1 F. 3d at 1264-65, 1272. Most appropriately, this method of apportionment of attorneys fees

was applied in the San Juan DuPont Plaza Hotel Fire litigation. <u>In re: Thirteen Appeals Arising Out of the San Juan DuPont Plaza Hotel Fire Litigation,</u> 56 F. 2d 295 (1st Cir. 1995). This case was resolved on a percentage of the common fund that was, in fact, a fund comprised purely of attorneys' fees. <u>Id.</u> The First Circuit noted that the percentage of the fund approach is preferable to the lodestar method of calculating attorneys' fees in these situations. <u>Id.</u> at 307. This approach is in the interests of judicial economy in that the judge need not scrutinize every hour logged to determine the reasonableness and necessity of the work, but merely reviews an attorney's hours as one factor in determining that attorney's contribution to the overall litigation. <u>Id.</u> Further, as this method of apportionment is result oriented, it discourages attorneys from racking up unnecessary billings with the hopes of a greater piece of the pie under a lodestar calculation of attorneys' fees. <u>Id.</u>

Although the courts generally have not used the phrase "unjust enrichment," to describe percentage-of-the-fund apportionment, the two principles employ the same concept. In both, recovery is based on the claimant's contribution to the end result. <u>See TVL Associates v. A & M Const. Corp.</u>, 474 A. 2d 156, 160 (D.C. 1984) (*quantum meruit* claim rejected because claimant failed to show value of the benefit to person against whom restitution was sought); <u>Swedish Hospital,</u> 1 F.3d at 1271 (employing percentage-of-the-fund apportionment in class action cases). An unjust enrichment claimant is entitled to the value of her services "as measured by the extent to which his [the recipients] property has been increased, or his other interests have been advanced. "

Rest. Cont. (Second) § 371, Comment (a) (1981)[5]; <u>See</u>  <u>TVL</u>, 474 A. 2d at 160 (*quantum meruit* claim rejected because claimant failed to show value of the benefit to person against whom restitution was sought).   Similarly, an attorney claiming fees from a common fund is entitled to a percentage of the award or judgment that resulted from his or her contributions to the case. <u>Swedish Hospital,</u> 1 F.3d at 1272.

A percentage of the funds calculation, taking into account Ms. Kagy's contribution to the <u>Eisenfeld and Duker</u> case, including the work that was initially completed in <u>Flatow,</u> is a fair and reasonable basis for awarding her attorneys fees in this case. Mr. Condon's testimony will assist the trier of fact in considering the appropriateness of the percentage of the fund approach to apportioning the fees in this case, as well as the factors to consider when applying the percentage of the fund analysis. Mr. Condon will also testify as to the inappropriateness of the lodestar method of attorney-fee calculation.  He also will testify that applying the lodestar method would be onerous and a waste of the court's time as each line entry for each approximation of Ms. Kagy's hours would be the subject of testimony, cross-examination, and then scrutiny by the Court.    There is no way for Ms. Kagy to accurately reconstruct the time she spent on <u>Flatow</u> and <u>Eisenfeld and Duker</u> five years or more ago.  It is patently unfair to require her to do so in order to claim compensation for her work in light of the fact that Mr. Perles has admitted in sworn testimony that he never asked her for her recorded hours.

---

[5] "The reasonable value to the party from whom restitution is sought . . . is however, usually greater than the addition to his wealth. . . If this is so, a party seeking restitution is generally allowed the more generous measure of reasonable value. . .  " Rest. Cont. (Second) § 371, Comment (b) (1981).

For the above-mentioned reasons, Ms. Kagy is entitled to one-third of Mr. Perles's fee in Eisenfeld and Duker in her claim for compensation under a quasi-contract/unjust enrichment theory of recovery.

### III.   Determination of the Fees Due to Anne-Marie Lund Kagy Pursuant to the Oral Contract for Her Work on Flatow.

In his Decision and Order of April 10, 2003, Judge Jackson found that Anne-Marie Lund Kagy was entitled to "one-third of any net fee paid to Stephen R. Perles, P.C. in the Case of Flatow v. The Islamic Republic of Iran, et al.. In response to the April 15, 2003, Order from Judge Kay that Mr. Perles file a statement of net fee, Mr. Perles filed a document that listed many questionable expenditures deducting everyday office overhead expenses from his net fee. This practice is a radical departure from the course of conduct that Mr. Perles and Ms. Kagy established for determining her compensation through their work on the twenty claims under the Holocaust Survivors Claims Program, and the Nygard-Huff contingency claim.

Nine of those twenty Holocaust claims proved successful.[6] In six of those claims, Steven R. Perles, P.C. was the only law firm representing the client. For each of those claims, Ms. Kagy received precisely one-third of the amount Steven R. Perles, P.C. received for its fee. In the three claims for which Mr. Perles had been retained by counsel for the claimant, Steven R. Perles, P.C. split the gross fees equally with co-counsel. Again, in these cases, Ms. Kagy received precisely one-third of the amount Steven R. Perles, P.C. received for its fee. After consultation, Mr. Perles and Ms. Kagy determined that approximately $2,500 in expenses could not be recovered from the twenty clients.

---

[6] Exhibit J-2, Tab 2; Document no. 000015 (sealed document due to client confidentiality).

Ms. Kagy shared in that loss by deducting $833.33 from one of her invoices for payment. Ms. Kagy received no compensation for her work on the 11 Holocaust cases where no recovery was obtained.

No indirect expenses, such as office overhead, were offset from the gross Steven R. Perles, P.C. recovered in determining Ms. Kagy's fee for her work on the nine successful Holocaust claims. In fact, both Ms. Kagy and Mr. Perles testified about the reason Mr. Perles stated in refusing to raise her percentage in the Holocaust matters during the May 1997 telephone conversation. This conversation either formed their agreement that she would receive one-third of his net fee for all contingent matters in his office, or was an amendment of a prior agreement. Mr. Perles readily admitted that he bore the risk of fronting expenses and all the office overhead. Therefore, the offsets for $199,608.08 in allocable indirect expenses that Mr. Perles now seeks, none of which were disclosed in response to discovery requests, are beyond the scope of their agreement and their course of conduct, and therefore should be disallowed.

Mr. Perles also seeks offsets for payments made to local counsel, expert witnesses, and others, totaling $231,000. Other than check stubs,[7] and despite requests in discovery that he provide documentation of his expenses in Eisenfeld and Duker and Flatow, as well as any agreements for payment to other attorneys, experts, or other vendors, (See First Request for Production of Documents, ¶2). Mr. Perles has failed to substantiate his contractual obligation to make any of these payments. Because these payments are also inconsistent with Ms. Kagy's understanding of how these individuals

---

[7] Ms. Kagy notes that not even a check stub  has been presented to substantiate Mr. Perles's claim of a $50,000 payment to Rabbi Kranz for "Hill Assistance," nor was the fact of this payment, or obligation to make this payment disclosed in discovery.

were to be compensated, she respectfully requests that the Court disallow all $231,000 in offsets Mr. Perles seeks in the calculation of her net fee.

Mr. Perles's fees were made in two payments from the <u>Flatow</u> client trust account, totaling $4,346,402.74. Exhibit P p. 7. Based upon their established course of conduct, Ms. Kagy's fee is precisely one-third that amount, or $1,448,800.91.

### IV.    Ms. Kagy is Entitled to Interest From the Disbursement Date at a Rate of Nine Percent

In her Counterclaim, Ms. Kagy requested prejudgment interest on the contractual amount owed to her from the date of disbursement of the fees. The Court has the discretion to include prejudgment interest as an element of damages if such an amount is necessary to fully compensate the plaintiff. D.C. Code § 15-109. The rate of interest to be applied is the prime rate in effect on the date of the breach of contract, which would be the date Mr. Perles disbursed payment to other attorneys and vendors involved in <u>Flatow</u> and <u>Eisenfeld and Duker</u>. <u>Shalom Baranes Associates v. 900 F. Street Corp.</u>, 940 F. Supp. 1, 6  (D.C.  Cir. 1996).  Ms. Kagy requests the Court take judicial notice that when Mr. Perles's one-third share of the funds were disbursed on January 17, 2001,  the client trust accounts to Mr. Perles, the prime rate was nine percent (9 %). <u>See</u> Exhibit P, p. 3; Federal Reserve Website, (http://research.stlouisfed.org/fred2/data/PRIME.txt). Ms. Kagy testified before Judge Jackson as to the desperate nature of her finances as she labored for Mr. Perles with the understanding that when the <u>Flatow</u> and <u>Eisenfeld and Duker</u> cases came through, she would be "set for life." Therefore, prejudgment interest is necessary to fully compensate Ms. Kagy and to redress any losses in investment value she could have reaped in the nearly three years since the $2.9 million contract came due.

For foregoing reasons, Ms. Kagy requests that the Court order pre-judgment interest on the net fee in <u>Flatow</u> as well as on the amount the Court deems is owed to her on <u>Eisenfeld and Duker</u> at the rate of nine percent (9%).

<u>**Conclusion**</u>

In order to reach an orderly conclusion to this case, Ms. Kagy seeks a ruling from Judge Magistrate Kay as follows:

I.       A determination that she is entitled to one-third of Mr. Perles's fee in <u>Eisenfeld and Duker</u> under an implied-in-fact theory of *quantum meruit*; or,

II.      That she is entitled to a percentage of the fund recovery under a theory of unjust enrichment and determine a reasonable percentage based on her contribution to <u>Eisenfeld and Duker</u> is one-third of Mr. Perles's net fee;

III.     A determination of a net fee calculation in both cases;[8] and

IV.     A determination that Ms. Kagy is entitled to pre-judgment interest from the date Mr. Perles disbursed his share of the attorneys fees to himself, personally, on January 17, 2001.

---

[8] Ms. Kagy notes that if the Court finds that she is also entitled to one-third of Mr. Perles's net fee in <u>Eisenfeld and Duker</u> whether under an implied-in-fact, or in *quantum meriut*/unjust enrichment, it will not be necessary to take evidence on the net fee issue. Mr. Perles has pled and testified that the combined fees received by Steven R. Perles, P.C. for the <u>Flatow</u> and <u>Eisenfeld and Duker</u> cases was $8,963,764.49. Jan. 23 (a.m.) Tr. p. 7 ln 21- p. 8 ln. 11; Statement of Matrial Facts as to Which There is No Genuine Dispute, ¶20; Memorandum in Support of Motion for Summary Judgment at p. 7. Therefore, Ms. Kagy's share of the combined fee would be $2,987,921.50.  Mr. Perles also received $18,548.45 in interest that accrued on that fee while it was on deposit for two weeks in the client trust accounts. <u>See</u> Exhibit P pp. 5-7 (January 31, 2001 disbursements).  Ms. Kagy's share of that interest would be $6,182.82, for a total amount due of $2,994,104.32.

Respectfully Submitted,
Anne-Marie Lund Kagy

By Counsel

**SHER CUMMINGS AND ELLIS**

_____/s/_____
David E. Sher, Esq., DC Bar No. 176396
Mark D. Cummings, Esq.,  DC Bar No. 414596
3800 North Fairfax Drive, Suite 7
Arlington, Virginia 22203
Tel.  (703) 525-1200
Fax.  (703) 525-0067
Counsel for Defendant/Counterclaim Plaintiff/
        Third-Party Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certified that on the 10th day of December, 2003, I caused a copy of the foregoing pleadings to be served by electronic transmission to the following persons at their last known address as listed below.

Steven M. Schneebaum, Esq.
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC  20037

_____/s/_____
David E. Sher, Esq.