UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN R. PERLES,

                    Plaintiff,

        v.                                          Civil Action No. 01-0105
                                                              (AK)
ANNE MARIE KAGY,

                    Defendant.

## MEMORANDUM OPINION

        The above-captioned case was referred to this Court by Judge Thomas Penfield Jackson

pursuant to Rule 72.3(a) of the Local Rules of the United States District Court for the District of

Columbia for a ruling on the issue of *quantum meruit* in consequence of legal services provided

by Defendant Kagy to Plaintiff Perles in *Eisenfeld and Duker v. Islamic Republic of Iran*, No. 98-

1945 (D.D.C.)  Additionally, on December 17, 2004, Judge Ellen Huvelle referred this case to

this Court for all purposes, pursuant to Rule 73.1 (a).

## I.    FACTUAL BACKGROUND

        This case involves a dispute between two attorneys, Stephen R. Perles and Ann Marie

Kagy, concerning the appropriate fees, if any, owed to Ms. Kagy and based on *quantum meruit* in

consequence of the work done on the *Eisenfeld* and *Duker* case.  The dispute with regard to

Kagy's work on *Flatow v. Islamic Republic of Iran*, No. 97-0396 (D.D.C.) has been resolved by

this Court in its August 18, 2004 Decision and Order, and Judge Huvelle's 11/29/04 Order

affirming the same.

On April 10, 2003, Judge Jackson, the trial judge previously assigned to this case, ruled

that an oral contract existed between Perles and Kagy with regard to the *Flatow* litigation.  (*See*

4/10/03, Decision and Order at 8.)  In a motion to amend this decision, Kagy argued that the oral

contract found by the Court to have existed for the *Flatow* representation likewise existed for the

*Eisenfeld* and *Duker* case.  The Court, rejecting Kagy's arguments, ruled that "the *Eisenfeld* and

*Duker* case <u>as such</u> was clearly <u>not</u> within the contemplation of either Mr. Perles or Ms. Kagy at

the time of the conversation and consequently is not embraced within the oral contract formed."

(7/10/03 Order at 1-2)(emphasis in original)

Thereafter, Judge Jackson referred the *Flatow* case to this Court for a determination of

any remaining issues and Kagy's claim for *quantum meruit* arising from the *Eisenfeld* and *Duker*

case.  (*See* 8/22/03 Order.)  Following that referral, Judge Jackson left the Federal bench, and

both cases were re-assigned to Judge Huvelle, who, on January 17, 2004, with consent of the

parties, referred all remaining issues in this case to the Undersigned for all purposes.  An

evidentiary hearing on the *Eisenfeld* and *Duker* case was held between December 16, 2003 and

December 18, 2003 with closing arguments conducted on December 10, 2004.

The remaining issue in this case is Kagy's counterclaim for breach of contract, or in the

alternative, for equitable remuneration for the work she performed for Perles in the *Eisenfeld* and

*Duker* case.

## II.    ANALYSIS

### a.    *Express Oral Contract in Flatow*

In his pre-trial memoranda and at closing arguments, Perles maintained that Judge Jackson's ruling - that the oral contract formed between the parties regarding *Flatow* did not include a similar understanding for *Eisenfeld* and *Duker* - necessarily precludes a finding by this Court that an agreement existed for that case.  This Court cannot agree.  The law of the case is not that no contract existed for *Eisenfeld* and *Duker*, but merely that no *express* contract existed.  Judge Jackson's April 10, 2003 Decision and Order states that the *Eisenfeld* and *Duker* case was not contemplated by the parties in the same oral contract for Kagy's legal services in *Flatow*.  That finding means, as a matter of law, that an express contract existed for *Flatow* and that no express contract existed for *Eisenfeld* and *Duker*.[1]  The decision of Judge Jackson does not address whether an implied-in-fact contract existed for *Eisenfeld* and *Duker*.  A contract implied-in-fact "differs from other contracts only in that it has not been committed to writing *or stated orally in express terms*."  *Vereen v. Claiborne*, 623 A.2d 1190, 1193 (D.C. 1993) (emphasis added) (citing *Bloomgarden v. Coyer,* 479 F.2d 201, 208 (D.C. Cir. 1973).  Judge Jackson's Order affirms the lack of an express contract in *Eisenfeld* and *Duker*.  Whether a contract implied-in-fact existed in that case, however, thus far remains an open question, and will therefore be analyzed below.

---

[1]In fact, Judge Jackson's Decision states only that no express contract existed in *Eisenfeld* and *Duker* from one particular conversation between Perles and Kagy. (*See* April 10, 2003 Decision and Order at 10, n.9.) That finding does not preclude an independent finding by this Court that an express contract was formulated at a different time.  Nevertheless, because Kagy does not advance any argument for the existence of an express contract for *Eisenfeld* and *Duker*, the Court will not explore further such a possibility.

b.      *Does an Implied-In-Fact Contract Exist Between the Parties?*

_____To establish the existence of a contract implied-in-fact in the District of Columbia, a party must initially demonstrate, (1) that valuable services were rendered, (2) to the person from whom recovery is sought, (3) which services were accepted by that person, and (4) under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person. *Vereen*, 623 A.2d 1190 (citing *In re Rich*, 337 A.2d 764, 766 (D.C. 1975).

The first three elements are quickly resolved.  There is no dispute between the parties that there were valuable services[2] provided by Kagy to Perles and that Perles accepted said services. (*See* Perles Complaint at ¶s 21, 22, 53.)[3]  According to Perles, one disputed element is whether he had reasonable notice that Kagy expected to be paid for the benefit conferred, noticing that, "the fourth element is critical, and its absence, all things being equal, can alone defeat a *quantum meruit* case."  (Perles Amended Pretrial Brief, at 8)(citing *Dorsky Dodgson & Partners, Inc. v. National Council of Senior Citizens,* 766 A.2d 54, 58 (D.C. 2001)).  In *Dorsky*, the plaintiff was suing to recover for architectural work done on two separate projects.  *Id.*  Although the plaintiff in *Dorsky* claimed entitlement to *quantum meruit* in its complaint, in all subsequent pleadings it did not "mention the words quantum meruit or explain how its claim for damages . . . met the requirement of that doctrine."  *Dorsky*, 766 A.2d at 58.  In contrast Kagy has offered affirmative evidence in support of her claim of an implied-in-fact contract.

Perles' awareness of Kagy's expectation of payment is supported by his own testimony

---

[2]The parties disagree on the value of the services.

[3]Although Perles states that Kagy's work on *Eisenfeld* and *Duker* was not 'substantial,' that fact, albeit a limitation on his valuation of those services, nevertheless supports the conclusion that services were rendered. (Plaintiff Complaint at ¶ 22; *See* Perles Answer at ¶ 50.)

and pleadings.  Plaintiff states in his initial complaint that there existed, "a contractual obligation to pay Defendant for her work on *Flatow* and related cases."  (Plaintiff Complaint at ¶ 53.)  The 'related cases' mentioned in this averment are clearly *Eisenfeld* and *Duker*.  No other cases are referenced throughout Perles' complaint as being in contention between the parties, no other fee arrangements are in fact in dispute, and *Eisenfeld* and *Duker* appears from the evidence to be the only case closely related to *Flatow*, in Perles' practice, and on which Kagy participated. (*See* 1/22/03 Tr. at 9.)

On numerous occasions throughout Perles' legal representation of *Eisenfeld* and *Duker*, Kagy initiated discussions with Perles regarding her expectation of payment for her services and her desire to formalize a fee arrangement. (Ambush Deposition at 30-35.)  This fact makes clear that Kagy had an expectation of payment for the benefit conferred, but more importantly, that Perles was aware of Kagy's expectation of payment for her work on *Eisenfeld* and *Duker*. Therefore, from the evidence and averments made by both parties, the Court is convinced and finds that the first four elements required for a finding of an implied-in-fact contract have been established by Kagy.

A contract implied-in-fact "is a true contract, containing all the necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties and the millieu in which they dealt." *Vereen*, 623 A.2d at 1993 (quoting *Bloomgarden*, 479 F.2d at 208 (internal citations omitted)). Thus, although finding the existence of four of the elements of an implied-in-fact contract, the Court must also consider whether traditional fundamental contract elements exist.  One such element, and indeed the one the Court finds determinative, is

that all contracts contain an agreement as to all material terms including an agreement on

consideration.  *Simon v. Circle Associates, Inc.*, 753 A.2d 1006, 1012 (D.C. 2000) (quoting

*Georgetown Entertainment Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985); *See*

*also Lowry's Reports,, Inc. v. Legg Mason, Inc.,* 271 F.Supp.2d 737 (D.M.D. 2003) (stating that

under Maryland law, implied-in-fact contracts "require[] a manifestation of mutual assent

sufficiently definite to assure that the parties are truly agreed with respect to all material terms");

*See also Buzzmarketing, LLC v. Upper Deck Co., LLC*, 2004 WL 966241 (E.D.P.A. 2004).

Agreement as to all material terms is a prerequisite to finding an implied-in-fact contract

between the parties. *Simon*, 753 A.2d at 1012 (D.C. 2000) (quoting *Georgetown Entertainment*

*Corporation,* 496 A.2d at 590 (D.C. 1985).  The Court must find that there was an agreement

between the parties as to the amount of remuneration to be received by Kagy for her work.

*Simon*, 753 A.2d at 1012; *See also Malone v. Saxony Cooperative Apartments, Inc.,* 763 A.2d

725, 729 (D.C. 2000) (holding that "failure to agree on or even discuss an essential term of a

contract may indicated that the mutual assent required to make or modify a contract is lacking."

*Malone*, 763 A.2d at 729 (D.C. 2000) (quoting *Owen v. Owen*, 427 A.2d 933, 937 (D.C. 1981).

This Court cannot say that there existed an agreement between the parties as to the

material term of compensation for the work that Kagy did for Perles.  The Court finds from the

evidence presented that both parties expected that Kagy would receive remuneration if *Eisenfeld*

and *Duker* prevailed and moneys were paid, but the Court cannot conclusively say what the

amount of that remuneration would be or whether the parties shared an understanding as to the

amount to be paid.  Kagy argues she is entitled to one third of Perles' fee and Perles argues she is

entitled to a fee of $50.00 an hour.  That is the extent of the evidence presented to the Court.

Under well settled contract law, the lack of precision as to material terms such as remuneration are fatal to the existence of an enforceable contract.  *See Butler v. Kemmerer*, 67 A. 332 (Pa 1907) ("an offer must be so complete that upon acceptance an agreement is formed which contains all of the terms necessary to determine whether the contract has been performed or not....An indefinite or uncertain contract cannot be enforced.")  According to the *Butler* court, promises made by a decedent in his lifetime to provide a portion of the estate, or an agreement by a landlord to reduce the rent without naming the amount of reduction, or a contract to take press reports "at not more than $300 per week, without other provisions" are all "too indefinite to allow recovery."  *Id.*, 67 A. at 333.  An agreement to provide attorney services without a clear expression as to the amount of payment in consideration of these services is too indefinite to allow for 'contractual' recovery.

Thus, while finding the existence of most of the elements of an implied-in-fact contract as expressed by the D.C. Court in *Vereen*, this Court nevertheless concludes that the law of the District of Columbia does not create an enforceable contractual relationship between Kagy and Perles, because there is a lack of an agreement as to a material term in the relationship.  *See Malone*, 763 A.2d at 729 (D.C. 2000); *See also*, *Rosenthal v. National Produce Co., Inc.*, 573 A.2d 365, 369-370 (D.C. 1990).

The Court now turns to non-contractual and equitable considerations in determining the amount owed by Perles to Kagy for services in *Eisenfeld* and *Duker*.

  c.  *Non-Contractual Remedies*

The parties reference *quantum meruit*, quasi-contracts, unjust enrichment, contracts implied-in-fact, and contracts implied-in-law but disagree as to the definitions and legal scope of those terms.  The Court will initially discuss those remedies.

In addition to true contracts, whether express or implied-in-fact, the law provides legal remedies for a third relationship, called contracts implied-in-law, or quasi-contracts.  *See Vereen*, 623 A.2d at 1174.  A quasi-contract, "is not a contract at all, but a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment." *Id*., (quoting *Bloomgarden*, 479 F.2d at 208).

Perles understands *quantum meruit* as being a limited equitable form of relief (i.e. quasi-contracts or contracts implied-in-law), that can only exist in the absence of an express, written, oral, or implied-in-fact contract. (Perles Amended Pre-Trial Brief at 8 (citing *Woodner v. Lauder*, 531 A.2d 280, 287 (D.C. 1987)).  Kagy, in contrast, discusses *quantum meruit* as a synonym for contracts implied-in-fact. (Kagy Pre-Trial Brief at 13.)

Several District of Columbia Court of Appeals cases equate *quantum meruit* to a contract implied-in-fact.  *Vereen*, 623 A.2d 1190 (citing *In re Rich*, 337 A.2d at 766; *See also, Smithy Company v. Washington Medical Center*, 374 A.2d 891 (D.C. 1977) (holding that "to demonstrate the existence of an implied-in-fact contract for services,"... "the party seeking payment must show that the services were carried out under such circumstances as to give the recipient reason to understand that the services were rendered for the recipient and not for some other person," and, "the party must demonstrate the existence of such circumstances as to put the recipient on notice that the services were not rendered gratuitously," and, "the party must prove

that the services were beneficial to the recipient.")(citing *Bloomgarden*, 479 F.2d 201.

In a separate line of cases, the District of Columbia Court of Appeals has applied this identical standard to find a quasi-contract, or a contract <u>implied-in-law</u>. *See Dorsky*, 766 A.2d 54.[4]

There are also District of Columbia Court of Appeals cases which applied the same test stated above to establish *quantum meruit* without reference to whether the Court found the relationship to be an implied-in-fact contract or a quasi-contract. *See Fred Ezra Company v. Pedas*, 682 A.2d 173 (D.C. 1996); *See also TVL Associates v. A & M Construction Corp.*, 474 A.2d 156 (D.C. 1984); *In Re Rich*, 337 A.2d at 766.

Thus, three lines of cases in the District of Columbia use the four-part test to describe different contractual or non-contractual relationships.

The confusion, surrounding the term *'quantum meruit'* is by no means unique to the District of Columbia Courts. *See* 66 Am. Jur. 2D *Restitution and Implied Contracts* § 37 (2004); CORBIN ON CONTRACTS § 1.20, at 62-63 (Rev. ED. 1993). *See also,* H. Hugh McConnell, *Distinguishing Quantum Meruit and Unjust Enrichment in the Construction Setting*, 71 Mar Fla. B.J. 88 (1997); Candace S. Kovacic, *A Proposal To Simplify Quantum Meruit Litigation*, 35 Am. U. L. Rev. 547 (1986).  There are several reasons for this confusion.  First, there currently exist in American jurisprudence two distinct definitions for *quantum meruit*, one as a synonym for

---

[4]Both *Vereen* and *Dorsky* utilize the four-part test first established in *In Re Rich* in their legal analysis.  In *Vereen*, it is used by the court to determine whether a contract implied-in-fact exists while in *Dorsky* it is used to determine whether a contact implied-in-law exists.

contracts <u>implied-in-fact</u> and the other a synonym for contracts <u>implied-in-law.</u>  D. DOBBS,

REMEDIES, § 4.2, at 237 (1973).  The lack of precision in the definition of *quantum meruit* can

be traced to its origins.  Historically, a cause of action only existed for traditional 'at-law'

remedies.  *See* A. CORBIN, CORBIN ON CONTRACTS, § 20 (1963).  Common law courts

developed over time an equitable cause of action, styled a writ of assumpsit, for "the enforcement

of promises that were not previously enforceable in the actions of covenant and debt."  *Id.* at 50-

51.  Different forms of assumpsit evolved to conform with various fact patterns in which, though

lacking an official seal (covenant) or express money payment (debt), a duty was thrust upon a

party through the equitable enforcement of a promise. *Id.*  These included such equitable

creations as 'special assumpsit,' 'express assumpsit,' 'implied assumpsit,' and 'indebitatus

assumpsit.' *Id.*  As Corbin explained,

> The common counts in assumpsit are merely abbreviated and stereotyped statements
> that the defendant is indebted to the plaintiff for a variety of commonly recurring
> reasons, such as money had and received, money lent, work and labor done, and goods
> sold and delivered.  They are allegations of indebtedness, and the action may be
> properly described as indebitatus assumpsit.  It was not required that the indebtedness
> should be an agreed amount or one that had already been computed and liquidated.
> Counts asking judgments for a reasonable amount for work done or for goods sold
> were described by the Latin phrases *quantum meruit* and *quantum valebat*.

*Id.* at 51.  Similarly with the various obligations expressed as contractual, or falling into one

category or another of assumpsit, "under the head of quasi contract are included numerous odds

and ends of obligation, without other pigeon holes in which to place them, even though they have

little in common with consensual agreement and may have great differences among themselves."

*Id.* at 49.

The term *quantum meruit* can therefore be used both to describe actual contracts that merely failed to conform with the required formalities of causes of action under covenant or debt, as well as to describe other non-contractual obligations thrust upon one party to provide restitution or to avoid 'unjust enrichment.' *See Id.* at § 19, p.44-50.

The classic elements for recovery under a non-legal contractual theory, or restitution, are that (1) the defendant received a benefit, (2) at the plaintiff's expense, and (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it. *See* GEORGE E. PALMER, RESTITUTION § 1.1, at 2; *See, e.g., Dorsky*, 766 A.2d at 58.

By contrast, the traditional elements of a contract implied-in-fact, a variety of a true enforceable contract, are (1) that the defendant requested the plaintiff to perform work, (2) that plaintiff expected the defendant to compensate him or her for those services, and (3) that the defendant knew or should have known that the plaintiff expected compensation. *See* S. WILLISTON, WILLISTON ON CONTRACTS § 3, at 8-10; *See, e.g. Vereen*, 623 A.2d 1190.

When viewing these two tests side by side, one substantive distinction becomes clear. In the former, the products or services have not been specifically requested, but are provided unilaterally, whereas in the second, they have been explicitly requested. *See,* Kovacic, 35 Am. U. L. Rev. at 550; PALMER, § 10.1, ("restitution frequently is given...[when] the plaintiff conferred a benefit on the defendant at the defendant's request," whereas in other instances, restitution is based on "an unsolicited benefit.")

The distinction between *quantum meruit* and unjust enrichment is not purely academic.

These two types of recovery carry with them different measures of recovery.  In unsolicited services or product cases, recovery is based on the benefit realized and retained by the defendant as a result of the plaintiff's work, whereas when specifically requested, the measure of recovery most often utilized by courts is the value of work and material provided. *See* 66 Am. Jur. 2D *Restitution and Implied Contracts* § 40; *See* RESTATEMENT (SECOND) OF CONTRACTS, § 371, comment (a), (1963); *See* RESTATEMENT (FIRST) OF RESTITUTION, § 1, comment (e), (1937).

Because the attempt by courts to do equity is inherently imprecise, it is not viewed to be helpful by this Court to identify with great precision the classification within which the present fact pattern falls, or to attempt to squeeze its factual contours into a preexisting terminological mold.  Rather the Court will take the facts as it finds them, and assign an appropriate remedy based upon the equitable principles that inhere.

As stated by this Circuit, "because quasi-contractual obligations rest upon equitable considerations, they do not arise when it would not be unfair for the recipient to keep the benefit without having to pay for it.  Thus, to make out his case, it is not enough for the plaintiff to prove merely that he has conferred an advantage upon the defendant, but he must demonstrate that retention of the benefit without compensating the one who conferred it is unjustified." *Bloomgarden*, 479 F.2d at 211; *Emerine v. Yancey*, 680 A.2d 1380.  This Court makes its determination considering principles of "equity and fairness." *Malonis v. Harrington*, 442 Mass. 692, 816 N.E.2d 115 (Mass. 2004).

Defendant Kagy argues to the Court that the value of her services in this case is identical

to the one-third contingency fee arrangement she held with Mr. Perles in *Flatow*.  (See Pre–Trial Brief at 14.)  Perles claims that the market value, or the best indicator of that value is based on the number of hours worked by Ms. Kagy on the case multiplied by the hourly rate she had received for work on other cases for Perles. (Perles Pre-Trial Brief at 7-8.)  The Court rejects both of the above.

The Court first must reiterate that its task in assessing an amount in *quantum meruit* is to apply equitable principles to ensure that the award is fair and equitable.  The Court does not find it prudent to speculate as to rates over which the parties disagree or arbitrarily assign a market rate to Kagy's work based on other cases.  To select one party's interpretation of the expectation of payment as a method for setting the market value would be to credit the testimony of one party over the other regarding the actual agreed upon remuneration, a matter that the Court has previously stated, was not settled at the time the services were performed.

Were the Court persuaded that an hourly rate of $50.00 was appropriate, or that a one third contingency was appropriate, it would have found that a contract implied-in-fact did, in fact, exist, and would have held the payment term consistent with such a finding.  Absent proof either way, the Court is left to do what in its discretion equity requires.

Perles' approach is inherently intuitive, as it assigns an hourly market rate to Kagy's work in *Eisenfeld* and *Duker*.  This approach focuses not on the amount actually recovered in this case by Perles, but rather on a lodestar formula.  Kagy's work in *Eisenfeld* and *Duker*, in 'benefit conferred' terms, cannot be formulaically applied to the final judgment amount, as Kagy urges, because several external factors also played a significant role in the final distribution of judgment

funds.  The benefit conferred is therefore best viewed as a factor of the amount of work Kagy did for Perles.[5]

Because the Court will employ an hourly rate formula, rather than a percentage of the pot or fund formula, the Court need not delve into complex and indeterminate factual questions such as whether Kagy substantially performed or whether she provided substantive assistance in the representation in this case or, perhaps equally significant, the lack of record evidence the Court can rely on to determine whether Kagy's assistance was of substantial value.

As previously stated, *quantum meruit* is premised, in part, on preventing the beneficiary from being enriched unjustly.  As such, the Court remains mindful of the financial benefit received by Perles in part if not full consequence of Kagy's services.  The Court will now discuss the germane equitable considerations and analysis under *Laffey v. Northwest Airlines*, 572 F.Supp. 354 (D.D.C. 1983).

<u>EQUITABLE FACTORS CONSIDERED BY THE COURT</u>

First, it appears from the evidence that the reason an agreement was never reached between these parties as to remuneration is due solely to Perles' intentional procrastination in establishing with Kagy a payment arrangement.  If, as Perles now concedes, the agreement between himself and Kagy for her services in *Eisenfeld* and *Duker* reflected a lodestar $50.00

---

[5]Although the Court will not assess the benefit conferred by Kagy in terms of the total fee received by Perles, it nonetheless remains in the Court's periphery.  Put another way, because *quantum meruit* is premised on preventing the beneficiary from being unjustly enriched, the Court cannot ignore the benefit received by Perles in determining an appropriate award to Kagy for her claim.

agreement, why did he not counter-propose this to Kagy in response to her attempts to finalize a fee agreement?  Equity does not permit a party to benefit unjustly.  *See Ross v. Ferro*, 659 A.2d 234 (D.C. 1995) (holding, as a matter of law, that the doctrine of 'unclean hands' bars a party from recovering a benefit from their own mis-dealings applies in the District of Columbia).

The Court sees no reason to question the hours claimed by Kagy to have worked on the case -- 167.23 hours (Kagy Trial Exhibit H-1.)  Again, had Perles formalized a payment arrangement with Kagy, and had their resulting agreement been for an hourly rate, the Court is confident that Kagy, as she did in other cases, would have kept detailed hours of the work performed.  The reason Kagy did not keep detailed hourly records was because she was kept in limbo by Perles, not because she was acting irresponsibly.  Perles does not, therefore, stand in a position to question Kagy's reconstruction, absent clear abuse.  Seeing none, the Court finds no reasons to depart from the hourly reconstruction Kagy has provided to the Court.

Perles' fee relationship with Kagy in his refusal to agree to specific terms while promising he would take care of her financially at best can only be characterized as unseemly.


FEE AWARD

The Court, having rejected the percentage fee advanced by Kagy and the $50.00 per hour fee advanced by Perles, will follow a lodestar approach in determining the fee award to Kagy from Perles for legal services rendered in the *Eisenfeld* and *Duker* case.  In calculating lodestar, the Court turns for guidance to *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part*, *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C. Cir. 1984),

in determining an appropriate rate under the unique circumstances of this case.

To employ the *Laffey* Matrix to the case at hand, the Court will begin not with the hourly rate of $50.00 suggested by Perles, but with Perles' hourly rate as it then existed for his legal services in his legal practice.  As this circuit explained, in determining a market rate for legal services, "'the best evidence would be the hourly rate customarily charged by the affiant himself or by his law firm.'"  *See Id*., 746 F.2d at 17, *citing National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319 (D.C. Cir. 1982).  The $50.00 figure suggested by Perles represents Kagy's hourly *salary* rather than a *market rate*, more akin to a billing rate, for her legal services.  In addition, the Court is mindful of the "complexity of the market for legal services, setting 'true value' for an individual attorney's services promises to be neither a science nor an art, but a largely arbitrary divination."  *Laffey*, 746 F.2d at 19.  To add to the complexity highlighted by the *Laffey* Court, here, the Court must not establish fees according to a statute, as was the case in *Laffey*, but must do equity.  "The action is not brought upon the contract, within the meaning of the statute, but upon 'the equities,' that is to say, upon certain acts of the parties which have been induced by the promise to convey, and the result of which would be a grave injustice to the plaintiff, such that no adequate remedy therefor could be had at law." STAFFORD, WENDELL PHILLIPS, A HAND BOOK OF EQUITY, p. 175, (National Law Book Company 1934), citing *Madison v. Alderson*, 8 App. Cas. 467 (L.R. 1883).

Concurrent with the need to make a finding based *upon the equities* the Court is careful to twine the arbitrary, otherwise, "no amount of calculation can restore objectivity."  *Laffey*, 746 F.2d at 19.

In beginning with Perles' hourly rate, the Court can better approximate how in this case, "a 'reasonable market rate' should be set" and can therefore avoid "a complex and expensive overlay of delusive mathematical form over a process fundamentally grounded in an arbitrary assessment." *Laffey*, 746 F.2d at 14. Additionally, this approach grounds the ensuing award in objectivity, and determines a starting place for a market rate based on an hourly 'benefit' to Perles of legal services. Perles' hourly rate, in the present circumstances, is, however, only a starting place, because 'the equities' beckon.[6]

First, the Court finds it appropriate to account for the differences in Perles' and Kagy's levels of legal experiences. *See Id.,* 572 F. Supp. at 371-372. Thus, where the *Laffey* Matrix found that an hourly rate for a junior associate approximated fifty-percent of the rate charged by an experienced litigator, so too this Court will apply the same approximate differential between Kagy's hourly rate and Perles' hourly rate to gauge an appropriate fee for Kagy's services in *Eisenfeld* and *Duker*.

Adjustments per *Laffey* are not solely diminutive, however. Under *Laffey*, a Court may also consider other factors (i.e. quality adjustments, exceptional circumstances) in departing upward from the hourly rate. *Id.*, 572 F. Supp. at 375-376; *Copeland v. Marshall,* 641 F.2d 880, 894 (D.C. Cir. 1980). While there is no evidence from the case at hand indicating an appropriateness to depart upward for the quality of the work performed (as all indications suggest

---

[6]*Laffey* endorses precisely this approach. As that Court stated, "*In almost every case, the firms' established billing rates will provide fair compensation,*" however, "to the extent unusual circumstances exist, those exceptional circumstances are best taken into account in adjustments of the lodestar." *Id.*, 746 F.2d at 24.

that the legal services provided by Kagy were somewhat formulaic), yet there is evidence suggesting that an upward adjustment is appropriate based on the "exceptional success" of the *Eisenfeld* and *Duker* case.  *See Hensley v. Eckert*, 461 U.S. 424, 435 (1983).  Although the *Laffey* case did not yield 'exceptional success' and therefore did "not fall within its embrace,*" Id.*, 746 F.2d at 29, the case presently before this Court most certainly does.[7]  The amount collected in contingency fees by Perles in relation to the level of legal difficultly necessary to litigate the case, and collect on the judgment, is staggering.

Although assigning a 'multiplier' to the market hourly rate based on the exceptional success of the litigation, may elude precision, it is nonetheless crucial to the case at hand in recognition of 'the equities' that this case presents.

Therefore, for computing Kagy's hourly lodestar rate, using as a guide the *Laffey* Matrix, Perles' usual hourly rate will be doubled to represent the 'exceptional success' departure sanctioned by both this Circuit in *Laffey* and the Supreme Court in *Hensley*.

The resultant number will then be multiplied by 0.5, or halved, to reflect the difference in legal experience between Perles and Kagy and will be the 'market hourly rate' to be used for compensating Kagy for the hours she worked on the *Eisenfeld* and *Duker* case.

Although grounded tangentially in the *Laffey* formula, the result reached by this Court still balances the concept of unjust enrichment with the actual services rendered by Ms. Kagy.

---

[7]The *Eisenfeld* and *Duker* case, it is critical to note, is not 'exceptional' based on the risks associated with its contingent nature, a characteristic the Circuit has ruled cannot be used in justifying an upward adjustment, but based on the 'exceptional success' of the litigation, a characteristic of a case appropriate for consideration by a trial court, in its discretion, for an enhancement.  *See Hensley*, 461 U.S. at 435.

This figure represents, therefore, the minimum that the Court believes, in its discretion, it must assess in light of all the circumstances, including Perles' representations in his fee discussions with Kagy, as the case may be, to prevent Perles from being unjustly enriched.

Based on the foregoing, the Court finds that an equitable compensation award to Kagy for her legal services provided to Perles in the *Eisenfeld* and *Duker* case shall be based on an hourly rate in accordance with the formula set forth herein, multiplied by the hours she worked on that case.

_____                              _____
   DATE                                           ALAN KAY
                                                  UNITED STATES MAGISTRATE JUDGE