# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**STEVEN R. PERLES, P.C.,**

Plaintiff and Counterclaim-Defendant,

v.

**ANNE MARIE KAGY,**

Defendant and Counterclaim-Plaintiff

v.

**STEVEN R. PERLES, ESQ.,**

Third-Party Defendant.

Civil Action No. 01-0105  (AK)

## DECISION AND ORDER[1]

The above-captioned case is before the Court for resolution of a dispute between two attorneys, Steven Perles and Anne Marie Kagy, over the amount of equitable compensation that Ms. Kagy is entitled to receive for services that she rendered while working for Mr. Perles' law firm. After considering the submissions of the parties and the evidence presented at the three-day bench trial, the Court issues the following Decision and Order.

---

[1] By consent of the parties, this case was referred to the undersigned Magistrate Judge for all purposes and trial pursuant to 28 U.S.C. § 636(c).  (*See* "Consent to Proceed Before a United States Magistrate Judge for All Purposes" [144].)

## I.      PROCEDURAL HISTORY[2]

This case began in 2001 when Steven Perles ("Perles") sought a declaratory judgment regarding the amount of money that he was required to pay Anne Marie Kagy ("Kagy") for work that she performed for his firm in two cases: *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) and *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (D.D.C. 2000).  *Perles v. Kagy*, 473 F.3d 1244, 1248 (D.C. Cir. 2007).  Following a bench trial, United States District Judge Thomas Penfield Jackson concluded that the parties had an oral contract that entitled Kagy to one-third of the fees that Perles recovered in *Flatow*.  (Decision and Order dated 4/10/03 [60].) Regarding Kagy's compensation for her work on *Eisenfeld*, this Court determined that no contract existed and that Kagy was only entitled to recover equitable remuneration.  *Perles v. Kagy*, 362 F.Supp.2d 195 (D.D.C. 2005).

Both parties appealed; Perles objected to Judge Jackson's finding that there was an enforceable contract in the *Flatow* litigation and the calculation of Kagy's equitable recovery in *Eisenfeld* and Kagy objected to this Court's finding that there was not an enforceable contract in the *Eisenfeld* case.  *Perles*, 473 F.3d at 1249.  On January 16, 2007, the United States Court of the Appeals for the District of Columbia Circuit reversed the District Court's holding that a contract existed between Perles and Kagy in *Flatow*, affirmed the finding that Kagy was entitled to equitable compensation in *Eisenfeld*, reversed the Court's determination that Ms. Kagy should be compensated at an hourly rate of $283, and vacated the District Court's judgment regarding compensation.  *Id*. at 1254.

---

[2] For a more detailed recitation of this case's history, see the Court of Appeals opinion at 473 F.3d 1244 (D.C. Cir. 2007) and this Court's opinion at 362 F.Supp.2d 195 (D.D.C. 2005).

The Court of Appeal remanded the case to this Court for a determination of three issues:

First, this Court must "assess the number of hours Kagy reasonably worked on the *Flatow* case."

*Id*.  Second, this Court must "determine whether District of Columbia law authorizes an

equitable adjustment that could yield a rate higher than $150 per hour," the floor accepted by the

Court of Appeals for Kagy's reasonable hourly rate.  *Id*.  Third, this Court "may also consider the

availability under District of Columbia law of pre-judgment interest."  *Id*.  To resolve these three

issues, the Court heard evidence during a bench trial on September 24 through September 26,

2007.[3]


## II.   **FINDINGS OF FACT**

###    A.      Kagy's Education and Experience

Anne-Marie Lund Kagy received her Juris Doctor degree from George Mason University

School of Law in 1994 and her LL.M. in International Legal Studies from American University's

Washington College of Law in 1996.  (Tr. 9/24/07 ("Tr. I") at 70.)  Kagy's LL.M. studies focused

on "international litigation and dispute resolution" and included "course work ranging from

conflicts of interest to international courts to international ligation and arbitration."  (Tr. I at 71.)

The LL.M. program exposed Kagy to many legal issues that later became relevant to her work on

the *Flatow* litigation.  For example, Kagy wrote a paper for an International Court seminar that

addressed the Foreign Sovereign Immunities Act ("FSIA") and the availability of immunity for

state sponsors of terrorism.  (Tr. I at 77.)  Other courses that Kagy took addressed international

judicial assistance and the enforcement of judgments overseas.  (Tr. I at 79.)

---

[3] Closing arguments were not presented until October 19, 2007.

3

Kagy's involvement with Steven Perles began in 1992 while Kagy was in her second year of law school.  (Tr. I at 71.)  From 1992 until 1995, Kagy worked with Perles in a law clerk capacity on a case called *Princz v. Federal Republic of Germany*, in which a Holocaust survivor sued the government of Germany for reparations.  (Tr. I at 72-73.)  The *Princz* case, like the *Flatow* case that was to follow, involved legislative activities and public relations in addition to litigation.  (Tr. I at 73.)  Kagy's involvement with *Princz* also led to her participation in a panel discussion at the Hugo Princz Conference at Washington College of Law in 1996.  (*Id.*)


B.    <u>Kagy's Work on *Flatow*</u>

Approximately one week after the Hugo Princz Conference, in late April or early May 1996, Perles contacted Kagy and asked her to provide a "quick analysis" of a piece of legislation that Congress had recently enacted.  (Tr. I at 74.)  Specifically, Perles wanted Kagy to analyze whether a bombing on land fell within any of the enumerated exceptions to foreign sovereign immunity.  (Tr. I at 75.)  In October 1996, Perles contacted Kagy again and informed her that the fact pattern they had previously discussed related to an American woman named Alisa Flatow who was killed in a bus bombing in Israel.  (Tr. I at 76.)  Perles had been retained by Alisa's father, Stephen Flatow, and wanted to know if Kagy was interested in "joining the team" as an attorney and working on what later became the *Flatow* case.  (Tr. I at 76-77.)  Kagy believed that "[i]t sounded like a very interesting case" and eventually decided to join Perles in litigating it. (Tr. I at 79, 81.)

Perles informed Kagy that because *Flatow* was a contingency case he would not be able to pay her contemporaneously.  (Tr. I at 84.)  Early in the litigation, Kagy expressed concerns

4

about how her fee would be calculated if she needed to leave the case before a judgment was collected.  (Tr. I at 99.)  Perles told her that if she was unable to continue working on the case he would "estimate" her hours and pay her a "generous multiple" of her hourly fee.[4]  (*Id*.)  Kagy specifically recalls that Perles indicated he would pay her ten times her hourly rate under those circumstances.  (*Id*.)  Despite the possibility that Kagy might eventually be compensated on an hourly basis, and despite the fact that she routinely kept time records for Perles' paying clients, Kagy did not feel that it was necessary to keep records of the time that she expended in *Flatow*. (Tr. 9/26/07 ("Tr. IV") at 27-28, 30-31.)  Perles discouraged her from keeping such records but never forbade her from doing so.  (Tr. IV at 27.)

Kagy worked on *Flatow* from November 1996 until January 2000.   During this time, she participated in all aspects of the litigation. Because Perles had no support staff, Kagy drafted legal documents but also engaged in the "less glamorous aspects" of legal work, such as compiling exhibits, making photocopies, and bring documents to the courthouse for filing.  (Tr. II at 88; Tr. IV at 48-49.)  Based on her independent recollection, as it was refreshed by reconstructed time records that she prepared for this litigation but which were not admitted at trial, Kagy testified in detail about her work on *Flatow* and the approximate number of hours that she expended on each task.[5]

Kagy's participation as a member of the *Flatow* legal team began with a memorandum that she wrote to Perles on November 8, 1996.  (Tr. 9/25/07, a.m. ("Tr. II") at 12.)  In this short

---

[4] For cases in which Perles paid Kagy contemporaneously for her work, her hourly rate was fifty dollars per hour.  (Tr. 9/25/07, p.m. ("Tr. III") at 66.)

[5] A table summarizing Kagy's activities in *Flatow* and the number of hours that she worked is set forth in Appendix A.

document, Kagy analyzed potential defendants for the *Flatow* action.  (Tr. II at 11-12; Ex. G-1.)  "[B]etween completing the research and actually discussing the task with Mr. Perles at the front end" she spent approximately two hours drafting the memorandum.  (Tr. II at 16.)  Kagy's involvement in the initial stages of the *Flatow* case also included a meeting with Perles, Stephen Flatow, and non-legal members of the litigation team in December 1996.  (Tr. II at 7-8.)  The meeting lasted approximately two hours and Kagy spent an additional two hours traveling and having discussions with Perles before and after the meeting.  (Tr. II at 8.)  As the litigation began to take shape, Kagy also spent two hours in February 1997 drafting "team letters" to Thomas Fortune Fay ("Fay") and other members of the team to confirm their participation.  (Tr. II at 21.)

From December 1996 until February 1997, Kagy expended fifty hours preparing the *Flatow* complaint, which had been drafted by someone else, for filing.  (Tr. II at 8.)  Kagy consulted with Fay and other attorneys about how certain portions of the claims should be expressed and checked the claims against the relevant legal provisions to ensure that the complaint tracked the statutory language.  (Tr. II at 8-9.)  Part of the fifty hours was also spent circulating drafts of the complaint to legal and non-legal members of the litigation team.  (*Id.*)  Kagy expended an additional twenty hours on February 25 and 26 preparing for a congressional press conference that coincided with the filing of the complaint.  (Tr. II at 22.)  This included making press packets, picking up Stephen Flatow from the airport, filing the complaint at the courthouse, attending the press conference, and attending meetings in congressional offices.  (Tr. II at 22-23.)  Kagy spent four hours in February 1997 drafting, circulating and editing the two-page case summary that was distributed at the press conference.  (Tr. II at 18.)  She also spent forty to fifty hours during January and February 1997 on legislative activities, such as educating

congressional offices about the case, that preceded the filing of the complaint, and ten hours

consulting with the State Department and Israeli officials regarding the filing of the complaint

(Tr. II at 13, 18, 19.)

On March 3, 1997, the *Flatow* team filed a Motion to Recuse Judge Lamberth.  (Tr. II at

23.)  Kagy spent five hours drafting, editing and filing this motion and two hours on March 4

filing an amended signature page for the motion.  (Tr. II at 23, 26.)  After Judge Lamberth denied

the Motion to Recuse, Kagy expended an additional one hour discussing the denial with Perles

and Fay.  (Tr. II at 27-28.)   Kagy spent the remainder of March 1997 engaged in post-filing

activities.  The *Flatow* case generated a great deal of attention in the press and in the academic

community and Kagy spent three to four hours a day, for a total of forty hours, responding to

correspondence.  (Tr. II at 27-28.)  Kagy acknowledged that this "was office support work" but

she "was the only person available to do it."  (Tr. II at 27.)

From March until June 1997, Kagy engaged in efforts to obtain services of process on the

*Flatow* defendants in accordance with the four-step process set forth in the Foreign Sovereign

Immunities Act.  (Tr. II at 28.)  First, Kagy spent five hours in pursuit of service by

accommodation.  (Tr. II at 30.)  With Perles's consent, Kagy contacted the Embassy of Pakistan

and two attorneys who had previously worked for the Iranian government to determine whether

any of them were authorized to accept legal documents on behalf of the Islamic Republic of Iran.

(Tr. II at 29.)  The second method of service under the FSIA, service under the Hague

Convention, did not apply because Iran is not a party.  (Tr. II at 30.)  Kagy then spent thirty hours

serving the defendants by certified mail.  (*Id.*)  This entailed preparing notices of suit for each

defendant, arranging for the notices to be translated into Farsi, making copies of the notices, and

bringing the certified mail packages to the post office.  (Tr. II at 30-31.)  Finally, Kagy sought

service through diplomatic channels by transmitting to the State Department the same package

that had been sent by certified mail.  (Tr. II at 31.)  Between copying the notices of suit,

consulting with the State Department and discussing the matter with Perles and Fay, Kagy spent

an additional ten hours on this phase of service.  (*Id*.)  Following these efforts, Kagy participated

in the filing of an *Ex Parte* Status Report on Service of Process with Judge Lamberth.  (Tr. II at

33.)  Kagy drafted the document, which includes a description of the methods of service under

the FSIA and a brief summary of the efforts that plaintiff's counsel had undertaken to accomplish

service of process, incorporated edits suggested by Perles, and filed it on May 21, 1997.  (*Id*.; Ex.

G-8.)  Overall Kagy worked on this document for six hours.  (Tr. II at 34.)

    After the defendants failed to respond to the complaint within sixty days, plaintiff's

counsel in *Flatow* filed a Motion for Entry of Default on September 3, 1997.  (Tr. II at 34.)  Kagy

spent approximately thirty hours drafting the motion and supporting memorandum, discussing

the motion with Perles, and incorporating edits that he provided.  (Tr. II at 36.)  After default was

entered, Kagy expended an additional ten hours serving the defendants with a notice of default.

(Tr. II at 38.)  As she did when serving the complaint, Kagy arranged for the notice of default to

be translated into Farsi and transmitted the notices to the State Department to be served on the

defendants.  (Tr. II at 39.)

    From June until November 10, 1997, Kagy worked on a document called "Plaintiff's *Ex*

*Parte* Brief on Dispositive Issues of Law" ("*Ex Parte* Brief").  In preparing to draft this brief,

Kagy spent approximately 100-200 hours conducting background research and reading in June,

July and August.  (Tr. II at 41.)  The research focused on possible defenses that the Iranian

government would raise should they file a motion to dismiss.  (Tr. II at 43.)  Kagy expended

1000 hours drafting the *Ex Parte* Brief, a forty-nine page document that addresses such issues as

bases for subject matter and personal jurisdiction and the availability of damages.  (Tr. II at 41;

Ex. 210.)  While drafting the brief, Kagy routinely worked from seven or eight o'clock in the

morning until ten o'clock at night, Monday through Friday, and worked an additional ten hours

on Saturdays and six hours on Sundays.  (Tr. IV at 93.)  Finally, Kagy expended an additional ten

hours on November 10 when the brief was filed.  (*Id*.)  After the *Ex Parte* Brief was filed,

plaintiff's counsel filed a supplemental memorandum alerting Judge Lamberth to a recent case in

Florida, called *Brothers to the Rescue*, in which a default judgment had been issued under the

new amendments to the FSIA.  (Tr. II at 44.)  This memorandum took Kagy six hours to draft

and prepare for filing.  (Tr. II at 45-46.)

During the course of her participation in the *Flatow* litigation, Kagy had occasion to assist

both Perles and Fay when they traveled to Israel.  In November 1997, Kagy expended

approximately ten to fifteen hours preparing Perles for his trip and providing him with support

while he was in Israel.  (Tr. II at 48-49.)  Kagy gathered contact information of people with

whom he would meet in Israel, packed his files, and prepared summaries of the case for him to

distribute.  (Tr. II at 49.)  When Fay traveled to Israel in February 1998 to interview witnesses

and collect evidence, Kagy spent five hours helping him find contact information and providing

him with other information as needed.  (Tr. II at 65.)  In preparation for Fay's trip, Kagy also

spent an additional twenty to twenty-five hours drafting a request for international judicial

assistance, which allowed depositions to be taken in Israel, and having the document translated

into Hebrew.  (Tr. II at 62, 84.)

9

On December 1, 1997, Kagy attended a status hearing with Judge Lamberth.  (Tr. II at 52.)  Between the time spent at the hearing, travel to and from the courthouse, and discussions with Perles and Fay, Kagy spent five hours working on *Flatow* on that date.  (*Id.*)  Immediately following the status conference, Kagy began drafting proposed Findings of Fact and Conclusions of Law, which were ultimately filed on January 5, 1998.  (Tr. II at 53.)  Fay, as trial counsel, prepared the initial version of the facts section while Kagy was primarily responsible for the conclusions of law.  (Tr. II at 54.)  In drafting her portion of the brief, Kagy used the work she had already done for the *Ex Parte* Brief and "retooled it" from an advocacy piece to a judicial piece.  (*Id.*)  Overall, Kagy spent 100 hours drafting and filing this document.  (Tr. II at 53.)

In January and February 1998, Kagy spent approximately eighty to 120 hours assisting Perles and Fay prepare for the *Flatow* trial.  (Tr. II at 54.)  Kagy prepared witness summaries and other documents and assisted Perles and Fay in any way she could.  (Tr. II at 54, 63.)  Kagy also expended fifty hours drafting two documents: a thirteen-page memorandum to Perles and Fay on February 20, 1998 addressing the issue of solatium and how it could be proved at trial and a document called "Plaintiff's *Ex Parte* Damages Hearing Memorandum, which was filed with the court on February 27, 1998.  (Tr. II at 66-68; Ex. G-21; Ex. G-23.)  Also in advance of trial, Kagy worked for four hours on preparing an affidavit for Stephen Flatow's signature.  (Tr. II at 68.)

The *Flatow* trial was held on March 2-3, 1998.  (Tr. II at 72.)  Kagy was present at the trial and spent ten hours each day "between court time, travel time and shuttling [ ] witnesses back and forth."  (*Id.*)  She expended an additional ten hours before and during the trial preparing a draft closing argument.  (Tr. II at 71.)  From March 3 until March 5, 1998, Kagy prepared a

second version of the proposed Findings of Fact and Conclusions of Law that incorporated the

evidence presented at trial.  (Tr. II at 73.)  Again, Fay was primarily responsible for the findings

of fact and Kagy was primarily responsible for the conclusions of law.  (Tr. II at 74.)  Kagy

estimates that she spent between twenty-five and twenty-eight hours preparing and filing this

document.[6]  (Tr. IV at 73.)

Judge Lamberth issued his judgment in *Flatow* on March 11, 1998.  (Tr. II at 79.)  In the

three days preceding the issuance of the judgment, Kagy assembled press packets for distribution

at a post-judgment press conference and contacted the State Department and Israeli Embassy "to

inform them that the judgment would be coming down."  (Tr. II at 80; Tr. IV at 75.)  On March

11, Kagy received an early copy of Judge Lamberth's opinion and brought it to a printer near the

courthouse so that it could be copied and included in the press packets.  (Tr. IV at 75-76.)

Overall, Kagy expended thirty hours on these judgment-related activities.  (Tr. II at 80.)  During

this same time period, Kagy also worked for fifteen hours on a document called "Plaintiff's *Ex*

*Parte* Memorandum of Law Concerning Collateral Attacks on Default Judgments Entered

Against Foreign States."  (Tr. II at 81.)

After the default judgment was issued, the *Flatow* litigation team turned their attention to

enforcement.  On March 28, 1998, Kagy wrote a memorandum to Perles, Fay and Sharon

Waxman regarding methods of enforcement and known Iranian assets.  (Tr. II at 82; Ex. G-28.)

Kagy worked on this memorandum for one week, expending approximately twenty-eight to thirty

hours.  (Tr. II at 83.)  On June 11, 1998, Kagy wrote another memorandum to Perles and Fay

---

[6] During her direct examination, Kagy stated that she spent between forty and fifty hours drafting the post-trial version of the proposed Findings of Fact and Conclusions of Law.  (Tr. II at 73.)  On cross examination, however, Kagy indicated that it was "probably more like 25 to 28 hours."  (Tr. IV at 73.)

addressing procedural issues that might arise in executing judgments against Iranian assets in the United States.  (Tr. II at 92; Ex. G-31.)  Including a meeting with Perles and Fay that led to the drafting of this document, Kagy expended five hours on the June 11 memorandum.  (Tr. II at 92.)  Although unrelated to enforcement, Kagy also spent two hours during April 1998 responding to an attorney who had contacted the State Department claiming to represent Stephen Flatow.  (Tr. II at 86.)

In furtherance of their enforcement efforts, the *Flatow* team filed writs of attachment against Iranian assets.  (Tr. II at 92-93.)  In July 1998, the United States entered its appearance in *Flatow*, made a motion to quash the writs, and filed a Statement of Interest.  (Tr. II at 94.)  Kagy spent five hours attending the hearing at which the United States entered its appearance and six hours attending the hearing on the government's motion to stay service of the writs.  (Tr. II at 96; Tr. III at 6-7.)  In light of the government's position, Judge Lamberth stayed service of the writs.  (Tr. II at 94.)  On July 24, 1998, Kagy wrote a memorandum to Perles, Fay and the *Flatow* file regarding her first impressions of the government's Statement of Interest.  (Tr. III at 6; Ex. G-40.)  Kagy spent ten hours drafting this memorandum.  (Tr. III at 11.)  Kagy spent five hours preparing a motion to lift the stay of the service of the writs, which was filed on July 27, 1998. (Tr. II at 95.)  Finally on August 11, 1998, plaintiff's counsel filed their Memorandum in Response to the Statement of Interest of the United States, a thirty-three page document with five appendices.  (Tr. III at 7-8; Ex. G-42.)  Kagy expended 100 hours analyzing the Statement of Interest, conducting research and circulating multiple drafts for review.  (Tr. III at 8.)

From November 1998 until the conclusion of her involvement in the *Flatow* case in January 2000, Kagy participated in enforcement actions in the District of Columbia, Maryland,

12

Texas and California.  Fay was primarily responsible for issuing the applications for the writs, but Kagy assisted him by drafting briefs for the related enforcement proceedings.  (Tr. III at 13-14.)  In November 1998, Kagy spent 100 hours drafting a brief, referred to at trial as the Brief on Change in Applicable Law, in a proceeding that related to former Iranian diplomatic and consular properties and accounts at NationsBank that held rents related to those properties.  (Tr. III at 16-17; Ex. G-48.)  Kagy also drafted a reply to a response filed by the United States in the NationsBank enforcement proceeding.  (Tr. III at 53.)  Kagy expended ten hours on this document, which was filed on December 30, 1998.  (*Id.*; Ex. G-58.)

A second set of enforcement proceedings in which Kagy was involved concerned property held by the Alavi Foundation in Maryland and Texas.  (Tr. III at 17.)  Kagy drafted two responses to the Alavi Foundation's Motion to Quash, one of which was filed in the District of Maryland on December 23, 1998 and one of which was filed in the Southern District of Texas on February 10, 1999.  (Ex. G-53; Ex. G-57.)  Kagy expended between 140 and 160 hours drafting the brief for the Maryland proceeding and another forty hours drafting the brief for the Texas proceeding.  (Tr. III at 25-26, 33.)  In April and May 1999, Kagy spent seventy to eighty hours preparing Perles for a hearing in the Alavi proceeding in Greenbelt, Maryland.  (Tr. IV. at 5.)  Finally in December 1999 and January 2000, after the Alavi proceeding was appealed to the United States Court of Appeals for the Fourth Circuit, Kagy spent an additional twenty-five hours drafting and editing the appellate brief and traveling to Richmond, Virginia to assist Fay with the filing.  (*Id.*)

A third enforcement proceeding in which Kagy participated related to an award of the Iran-United States Claims Tribunal in a case known as *Avco*.  (Ex. G-56.)  Kagy spent fifty hours

in early December 1998 drafting an opposition to the United States's motion to quash the writ of

attachment relating to the *Avco* Tribunal award.  (Tr. III at 38-39.)  A fourth enforcement

proceeding concerned an award that the Iranian military obtained against Cubic Defense Systems

in the Southern District of California.  (Tr. III at 34.)  In March 1999, Kagy drafted a motion to

allow Stephen Flatow to intervene in the case to facilitate attachment of the award.  (*Id.*)  Kagy

spent thirty hours drafting the motion to intervene and five hours drafting part of the appellate

brief that was filed with the United States Court of Appeals for the Ninth Circuit in December

1999.  (Tr. III at 34-35; Ex. G-55.)  The final enforcement action in which Kagy participated

involved Fay's attempt to attach Bank Saderat, which he believed to be a front for Iranian

interests.  (Tr. III at 35.)  Kagy expended forty hours in December 1999 drafting an opposition to

Bank Saderat's motion for release of the attached funds.  (Tr. III at 36; Ex. G-61.)

   Kagy engaged in several other *Flatow*-related activities in 1998 and 1999.  First, she

spent sixteen hours attending the International Law Association's International Law Weekend in

New York on November 14, 1998.  (Tr. III at 45-46.)  Kagy spoke about the case, at the direction

of Perles, as part of a panel on sovereign immunity.  (Tr. III at 46.)  Second, from January to

March 1999, Kagy spent sixty hours gathering information in support of a trial lawyer's award

for which Perles and Fay had been nominated.  (Tr. IV at 8.)  Next, in April 1999, Kagy

expended five hours drafting letters to congressional offices seeking support for the *Flatow*

enforcement efforts.  (Tr. III at 54; Ex. G-59.)  Kagy also spent forty hours drafting an article for

publication in the March 1999 issue of *Crime Victims Litigation Quarterly*.  (Tr. IV at 7.)

Kagy's was the only name on the article and she acknowledged that multiple purposes were

served by the article, including allowing her to publish a piece of her writing.  (Tr. IV at 79.)

Finally, on October 28, 1999, Kagy expended five hours drafting and filing a brief Notice of

Pending Legislation to inform Judge Lamberth of proposed amendments to the Foreign

Sovereign Immunities Act.  (Tr. III at 40; Ex. 60.)

Overall, Kagy was the only witness who was able to provide estimates of the time that

she spent working on the *Flatow* case.  Therefore the Court credits Kagy's uncontroverted

testimony that she expended somewhere between 2558 and 2753 hours on *Flatow*.[7]  The Court

will use the arithmetic mean of those figures, 2655.5 hours, as the starting point for calculating

her equitable compensation.

C.      Kagy's Work on *Eisenfeld*

The parties have stipulated that Kagy worked 167.23 hours on the *Eisenfeld* litigation.

(Statement of Stipulated Facts ¶ 13.)  Additionally, the Court of Appeals affirmed the District

Court's finding that Kagy worked 167.23 hours on *Eisenfeld*.  *Perles*, 473 F.3d at 1254.

Accordingly, this Court accepts 167.23 hours and the amount of time that Kagy reasonably

expended on the *Eisenfeld* case and will use this figure in computing her equitable compensation.

D.      Value of Kagy's Services

Kagy graduated law school in 1994.  (Tr. I at 70.)  Therefore when she began to work on

the *Flatow* case in November 1996 she had approximately three years of legal experience and

when she finished working on the case in January 2000 she had approximately six years of legal

---

[7] Kagy testified that she spent "no less than 2,750 hours" on the *Flatow* case.  (Tr. III at 70.)  After reviewing the transcript and summing the time estimates that Kagy provided for each task, however, the Court determined that the total number of hours that Kagy expended was between 2558 and 2753.

15

experience.  Based on the *Laffey* Matrix, which takes into account an attorney's level of

experience, as well as the nature of the *Flatow* litigation, Kagy testified that $250 per hour would

be an appropriate hourly rate for determining her equitable compensation.  (Tr. III at 64-68.)

Specifically, Kagy pointed to the novelty of the issues involved, her prior experience with

international litigation, the contingent nature of the case, the amount of recovery, and the security

risks involved as a basis for setting her hourly rate at $250.  (*Id.*)

Kagy stated that her hourly rate was fifty dollars per hour when Perles paid her

contemporaneously for her work.  (Tr. III at 66.)  Kagy acknowledged that the *Laffey* Matrix lists

the rates at which law firms bill the time of associates rather than the hourly rate that law firms

pay associates.  (Tr. IV at 83-84.)  Finally, Kagy further acknowledged that "law firms charge out

the time of associates at more or less three times their salaries."  (Tr. IV at 84.)  Stated

differently, the amount of money that a law firm pays an associate is approximately one-third of

the rate listed in the *Laffey* Matrix.


E.      Pre-Judgment Interest

When this litigation began, in January 2001, Perles set aside funds in a escrow account to

satisfy Kagy's claims.  (Tr. IV at 125.)  From January 31, 2001 until December 22, 2004, the

funds were held in an attorney escrow account at Patton Boggs LLP and from January 1, 2005

until August 31, 2005 they were held in an account at Greenberg Traurig LLP.  (Joint Ex. 1.)  On

September 1, 2005, the money was transferred to the Court Registry Investment System

("CRIS") account to serve as an appeal bond.  (*Id.*)  Pursuant to a September 12, 2007 order of

this Court, Perles withdrew the funds from the CRIS account on October 1 and deposited them in

16

Greenberg Traurig LLP's Citibank account on October 3.  (Supplement to Findings of Fact & Conclusions of Law ("Supplement") [163].)[8]  Finally, on October 11, Perles deposited $600,000, per this Court's order, in a new account.  (*Id*.)

While on deposit in these accounts, the interest rates ranged from 1.0% to 4.5%.  (*Id*.) The following chart depicts the various interest rates and the dates on which the funds accrued interest at those rates:

| Start Date | End Date | Number of Days | Interest Rate |
|:---:|:---:|:---:|:---:|
| 1/31/01 | 9/30/01 | 242 | 2.60% |
| 10/1/01 | 11/30/01 | 61 | 2.00% |
| 12/1/01 | 11/30/02 | 365 | 1.50% |
| 12/1/02 | 9/30/03 | 304 | 1.50% |
| 10/1/03 | 9/30/04 | 366 | 1.00% |
| 10/1/04 | 12/22/04 | 83 | 1.00% |
| 1/1/05 | 2/28/05 | 59 | 1.35% |
| 3/1/05 | 3/31/05 | 31 | 1.45% |
| 4/1/05 | 4/30/05 | 30 | 1.53% |
| 5/1/05 | 5/31/05 | 31 | 1.60% |
| 6/1/05 | 6/30/05 | 30 | 1.68% |
| 7/1/05 | 7/31/05 | 31 | 1.76% |
| 8/1/05 | 8/31/05 | 31 | 1.84% |
| 9/1/05 | 10/1/07 | 761 | 4.10% |
| 10/3/07 | 10/10/07 | 8 | 2.45% |
| 10/11/07 | 11/13/07 | 34 | 4.50% |

(Supplement [163].)

---

[8] Kagy's counsel stipulated to the information contained in this supplement.  (Tr. V at 5.)

III.     **CONCLUSIONS OF LAW**

A.     Lodestar Formula

To calculate an attorney's equitable compensation, "the court determines the reasonable number of hours and the attorney's hourly rate.  These figures are multiplied together to produce the 'lodestar,' or the reasonable value of the fees."  *Ginberg v. Tauber*, 678 A.2d 543, 552 n.12 (D.C. 1996).  The party seeking compensation bears the burden of submitting evidence of the number of hours she claims to have worked and rate at which she believes she is entitled to be paid.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Once the loadstar figure is calculated, the court may adjust it upward or downward based on the circumstances of the case, but "[t]he burden of justifying any deviation from the 'lodestar' rests on the party proposing the deviation."  *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980).  While the trial court "has discretion in determining the amount of the fee award," the court must "provide a concise but clear explanation of its reasons for" that award.  *Hensley*, 461 U.S. at 437.

The lodestar calculation is often used in cases where an attorney seeks a statutory award of fees, *see, e.g. Hensley v. Eckerhart*, 461 U.S. 424 (1983) (request for attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976); *Action on Smoking & Health v. Civil Aeronautics Bd.*, 724 F.2d 211 (D.C. Cir. 1984) (petition for attorney's fees under the Equal Access to Justice Act), or when an attorney sues a client on a *quantum meruit* theory, *see, e.g. Ginberg*, 678 A.2d at 544.  Nonetheless, the standards set forth in these cases "apply to the assessment of attorney fees in general."  *Frazier v. Franklin Inv. Co.*, 468 A.2d 1338, 1341 n.2 (D.C. 1983).

1.      *Number of Hours Kagy Reasonably Worked on Flatow*

During the bench trial, Kagy provided extensive testimony about the number of hours she

spent on various aspects of the *Flatow* litigation.  As discussed above, the Court concludes that

she spent 2655.5 hours working on *Flatow*.  However, the raw number of hours that an attorney

spent on a case is not the proper figure to use in the lodestar calculation because "[i]t does not

follow that the amount of time actually expended is the amount of time reasonably expended."

*Copeland*, 641 F.2d at 891.  To the contrary, an attorney may only be compensated for work that

is "'useful and of a type ordinarily necessary' to secure the final result obtained from the

litigation." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561

(1986) (quoting *Webb v. Bd. of Educ. of Dyer County*, 471 U.S. 234, 243 (1985)).  The attorney

"should make a good faith effort to exclude from a fee request hours that are excessive,

redundant, or otherwise unnecessary" and must exercise "billing judgment." *Hensley*, 461 U.S.

at 434.  It is not proper to request compensation for hours that would not be "properly billed to

one's client." *Copeland*, 641 F.2d at 891.

In an action for attorney's fees, the party seeking compensation "bears the burden of . . .

documenting the appropriate hours expended . . . ." *Hensley*, 461 U.S. at 437.  The attorney

"should maintain billing records in a manner that will enable a reviewing court to identify

distinct claims," and, "[w]here documentation of hours is inadequate, the district court may

reduce the award accordingly." *Id*. at 433, 437.  The D.C. Circuit takes the position that

contemporaneous time records are required to support a claim for attorney's fees, and has held

that "[c]asual after-the-fact estimates of time expended on a case are insufficient to support an

award of attorney's fees." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319,

1327 (D.C. Cir. 1982). *See also In re Olson*, 884 F.2d 1415, 1428 (D.C. Cir. 1989) (per curium)

("[W]e require that the applicant [for attorney's fees] submit 'contemporaneous time records of

hours worked and rates claimed' which sufficiently document the services rendered and prove

their reasonableness.") (quoting *In re Donovan*, 877 F.2d 982, 994 (D.C. Cir. 1989)).[9]  However,

the Court of Appeals has cautioned that the requirement of contemporaneous records "should not

be imposed in a draconian manner." *Action on Smoking in Health,* 724 F.2d at 220.  While

denial of attorney's fees may be warranted in some cases, the lack of documentation is generally

a basis for reducing attorney's fees rather than denying them outright. *Id. Accord Jordan v.*

*DOJ*, 691 F.2d 514, 518 (D.C. Cir. 1982) ("Outright denial may be justified when the party

seeking fees declines to proffer any substantiation in the form of affidavits, time sheets or the

like, or when the application is grossly or intolerably exaggerated, or manifestly filed in bad

faith.") (citations omitted).

 A court may exclude billing entries that are excessive, redundant, unnecessary, or

otherwise unreasonable. *See In re Olson*, 884 F.2d at 1429.  In *In re Olson*, the court disallowed

hours that the target of a grand jury investigation spent drafting grand jury instructions, noting:

"[b]ecause United States prosecuting attorneys are thoroughly competent to instruct grand juries

---

[9] Kagy cites to case law from the Fifth and Eleventh Circuits for the proposition that an attorney is not required to produce contemporaneous records in support of her claim for fees and that the absence of such documentation does not justify an automatic reduction in the hours the attorney claims to have worked. (*See* Def.'s Proposed Findings of Fact & Conclusions of Law at 12-13 (discussing *Johnson v. Univ. College*, 706 F.2d 1205, 1207 (11th Cir. 1983); *Harkless v. Sweeny Indep. School Dist.*, 608 F.2d 594, 597 (5th Cir. 1979)).)  Nonetheless, *National Association of Concerned Veterans* makes clear that this jurisdiction requires that an attorney produce something more than a reconstructed time record or a summary of work she claims to have done before a court can find that she sustained her burden of proving the number of hours she reasonably worked.  Additionally, the Sixth Circuit has taken a similar position to that of the D.C. Circuit, stating: "Where documentation is inadequate, or recently compiled retrospective estimations of time expended, the district court would do violence to its judicial obligations were it to accept the amounts claimed at their value." *United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Local 307 v. G&M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 (6th Cir. 1984). *See also In re Hudson & M.R. Co.*, 339 F.2d 114, 115 (2d Cir. 1964) (discussing the importance of contemporaneous time records and the inadequacy of estimates that are unsupported by daily records).

and rarely accept or use proffered grand jury instructions from a target of a grand jury investigation, we find these billings unnecessary and therefore unreasonable." *Id*. The court also found that "secretarial overtime" and "overtime dinner expense[s]" were not part of a "reasonable attorneys' fee." *Id*. Similarly, in *District of Columbia v. Hunt*, the D.C. Court of Appeals subtracted from an attorney's calculation of raw hours the time that at least two attorneys spent doing the same tasks. 525 A.2d 1015, 1016-17, n.1 (D.C. 1987).

Three aspects of Kagy's work on *Flatow* must be discounted in their entirety because they did not further the representation of the client and therefore were unnecessary. First, Kagy seeks compensation for sixteen hours that she spent traveling to and from New York for International Law Weekend and speaking on a panel on November 14, 1998. (Tr. III at 46-47.) This event provided Kagy with an opportunity to be recognized as an authority on foreign sovereign immunity and was not calculated to further the *Flatow* litigation. (Tr. IV at 46.) Second, Kagy testified that she should be compensated for the sixty hours that were expended preparing a packet of information in support of Perles and Fay's nomination for a trial lawyer's award. (Tr. IV at 8.) This activity was only related to *Flatow* in that Perles and Fay were being recognized for their work in *Flatow*. Finally, Kagy claims forty hours of compensable time for an article that she wrote for the Crime Victim's Litigation Quarterly. (Tr. IV at 7.) Again, this activity furthered Kagy's personal goals and not those of the *Flatow* litigation. These three tasks were unnecessary because they were not performed in preparing or prosecuting the *Flatow* case. Therefore Kagy cannot claim compensation for them. Therefore a total of 116 hours must be excluded from the raw total, resulting in a new total of 2539.5 hours that Kagy worked on the *Flatow* case.

21

Additional hours must be excluded from the raw total that Kagy provided on the grounds that they are excessive.  Kagy is seeking compensation for 1,250 hours that she spent drafting the *Ex Parte* Brief.[10]  Specifically, Kagy expended between 100 and 200, or approximately 150 hours, conducting background research, 1,000 drafting the brief, and another ten hours on the day that it was filed.  (Tr. II at 41.)  The research phase lasted from June until August 1997, the drafting phase continued from mid-August until November 9, and the document was filed on November 10, 1997.  (Tr. IV at 41-42.)  Kagy briefly stated the topics that were included in her research and discussed the significance of the *Ex Parte* Brief but otherwise did not elaborate about why this document took an inordinate amount of time to complete.  A percentage reduction is appropriate when the party seeking attorney's fees cannot sustain her burden of proving that the time she expended on a particular task was reasonable.  *See, e.g. Role Models Am. Inc., v. Brownlee,* 353 F.3d 962, 972-74 (D.C. Cir. 2004) (applying a 50% reduction when attorneys could not justify the number of hours spent on the litigation).  Accordingly, the Court will reduce the 1,000 hours for which Kagy claims compensation for drafting the brief by 40%, leaving her with 760 compensable hours for the *Ex Parte* Brief and resulting in a new total of 2139.5 hours for the *Flatow* litigation.[11]

A court can also apply a percentage reduction to the number of raw hours that the

---

[10] Kagy acknowledges that the amount of time she spent on the *Ex Parte* Brief - a single, forty-nine-page document - is equivalent to more than six months of work for a full time associate in a law firm.  (Tr. IV. at 90.)  Moreover, when the 1000 hours that she spent writing the brief is broken down over the approximately twelve weeks of the drafting phase, the calculation reveals that Kagy was working eighty three hours a week - or twelve hours a day, seven days a week.  The Court is skeptical that even the most dedicated and focused attorney could maintain a high level of productivity and concentration when working for twelve weeks at such a feverish pace.

[11] For the reasons discussed in n.12, the Court will not apply the 40% reduction to the 150 hours expended in the research phase.  Additionally, the reduction does not apply to the ten hours that Kagy spent on the day of filing because a reduction for the performance of ministerial tasks is addressed later in this opinion.

attorney claims to have worked if the attorney cannot produce contemporaneous time records.  In *Action on Smoking and Health v. Civil Aeronautics Board*, this Circuit calculated the fees that a non-profit was entitled to receive under the Equal Access to Justice Act for work performed by four of the organization's attorneys.  724 F.2d 211 (D.C. Cir. 1984).  The court reduced two of the attorneys' hours claims by one-third and ten percent, respectively, because, among other things, their hours were "almost completely undocumented."  *Id*. at 221-22, n.55, 223.  *See also Lively v. Flexible Packing Ass'n*, No. 05-CV-1474 (D.C. Aug. 23, 2007) (applying an eight percent reduction for unreliable billing records); *In re Olson*, 884 F.2d at 1430 (reducing otherwise allowable hours by 10% to account for hours that were "excessive, redundant, unnecessary, or inadequately documented").  As these cases demonstrate, the court has wide discretion is choosing a percentage by which to reduce an attorney's claimed number of hours to account for time that was not adequately documented.

As noted above, Kagy did not keep contemporaneous time records of her activities in the *Flatow* case.  (Tr. IV at 30-31.)  Although Perles discouraged her from keeping such records, he never prevented her from doing so.  (Tr. IV at 27.)  Moreover, Kagy was aware from the beginning of the litigation that there was a possibility of being paid on an hourly basis should she leave Perles's firm before the *Flatow* case concluded.  (Tr. III at 70-71.)  Because there were no contemporaneous time records to introduce at trial and because Kagy could not recall with precision the amount of time that she spent on each activity in the case, Kagy could not testify at the trial without continually refreshing her recollection from an inadmissible hearsay document.  Time records play an important role in attorney's fee cases by streamlining the presentation of evidence and ensuring that the fee award is based on an accurate accounting of hours expended.

When the records, for whatever reason, do not exist, the case law of this Circuit makes clear that

a percentage reduction is appropriate.  Therefore the Court will reduce Kagy's hours by 10% and

accordingly find that the reasonable number of hours for which she is entitled to compensation in

the *Flatow* case is 1925.55.

2.    *Kagy's Reasonable Hourly Rate for* Flatow *and* Eisenfeld

Having found that Kagy reasonably expended 1925.55 in the *Flatow* case, the next step in

the lodestar analysis is to determine Kagy's reasonable hourly rate and apply that rate to the total

number of hours that she reasonably expended in both *Flatow* and *Eisenfeld*.  The Court of

Appeals "accept[ed] $150 as the floor for Kagy's reasonable hourly rate and remand[ed] to the

District Court to determine whether District of Columbia law authorizes an equitable adjustment

that could yield a rate higher than $150 per hour."  *Perles*, 473 F.3d at 1254.  The Court of

Appeals set the floor at $150 because Kagy's market rate was $50 per hour and because Perles

represented in his brief and at oral argument that he would pay Kagy $150 per hour for her work

on *Flatow* and *Eisenfeld*.  *Id*.  Although this Court disagrees with the method by which the Court

of Appeals determined that $150 was Kagy's reasonable hourly rate, this Court concludes, for the

reasons discussed below, that $150 per hour is the appropriate rate to be used to value Kagy's

work in the two cases at issue.

An attorney's "reasonable hourly rate is that prevailing in the community for similar

work."  *Copeland*, 641 F.2d at 892.  In the District of Columbia, the prevailing market rates are

guided by the *Laffey* Matrix, which is prepared by the Civil Division of the United States

Attorney's Office for the District of Columbia.  *See Hansson v. Norton*, 411 F.3d 231, 236 (D.C.

Cir. 2005).  The matrix, which is broken down by year and updated annually to account for cost

24

of living increases, provides the reasonable hourly rates for attorneys at various levels of

experience. *Laffey* Matrix 1992-2003, Explanatory Note 2, *at* http://www.usdoj.gov/usao/

dc/Divisions/Civil_Division/Laffey_Matrix_2.html.  The *Laffey* Matrix is designed to apply in

the fee shifting context, and therefore reflects the fees that an attorney of a certain level of

experience would charge a client. *See id*. at Explanatory Note 1.  Kagy testified that it was her

understanding that firms pay associate attorneys appropriately one-third of the fees they charge to

clients.  (Tr. IV at 84.)  Nonetheless, the *Laffey* Matrix figures - adjusted to take into account the

difference between a fee charged to a client and the salary paid to an attorney - remains a useful

starting point for calculating Kagy's reasonable hourly rate.

      Kagy graduated from law school in 1994.  (Tr. I at 70.)  She worked on the *Flatow* case

from late-1996 until early-2000 and she worked on the *Eisenfeld* case from 1998 until 1999.

*Perles*, 473 F.3d at 1248.  Based on this information, the following is the relevant portion of the

*Laffey* Matrix:

|  | 96-97 | 97-98 | 98-99 | 99-00 |
|---|---|---|---|---|
| **4-7 years** | N/A | 195 | 195 | 200 |
| **1-3 years** | 150 | N/A | N/A | N/A |

*Laffey* Matrix 1992-2003.  Therefore the average hourly rate that an attorney with Kagy's level of

experience could reasonably charge a client for the years 1996-2000 was $185 per hour.

Considering that an associate such as Kagy would generally receive approximately one-third of

what a client pays in legal fees, Kagy's average reasonable hourly rate for the years she worked

on the *Flatow* litigation - according to the *Laffey* Matrix - was $61.67 per hour.  This reasonable

hourly rate is slightly greater than the $50 per hour Kagy received from Perles in other cases.

(Statement of Stipulated Facts ¶ 17.)

Also relevant to the determination of an attorney's reasonable hourly rate are the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 109 (1989).  These factors are:

  (1) the time and labor required;
  (2) the novelty and difficulty of the questions;
  (3) the skill requisite to perform the legal services properly;
  (4) the preclusion of other employment by the attorney due to acceptance of the case;
  (5) the customary fee;
  (6) whether the fee was fixed or contingent;
  (7) time limitations imposed by the client or the circumstances;
  (8) the amount involved and the results obtained;
  (9) the experience, reputation, and ability of the attorneys;
  (10) the "undesirability" of the case;
  (11) the nature and length of the professional relationship with the client; and
  (12) awards in similar cases

488 F.2d at 717-19.  The D.C. Circuit subsequently rejected factors (2), (6) and (8) as appropriate considerations in the lodestar analysis.  *See Palmer v. Palmer*, 950 F.2d 771, 784 (D.C. Cir. 1991) (holding that contingency enhancements are not available in the D.C. Circuit); *Thompson v. Kennickell*, 836 F.2d 616, 622 (D.C. Cir. 1988) (holding that "results obtained" is not an independent basis for adjusting an attorney's reasonable hourly rate), *overruled on other grounds by King v. Palmer*, 950 F.2d 771 (D.C. Cir. 1991); *Donnell v. United States*, 682 F.2d 240, 253 (D.C. Cir. 1982) (holding that whether a case is one of first impression, and therefore presents novel or difficult questions, is not an appropriate factor in the lodestar calculation).

Two of the *Johnson* factors are relevant in the present case.[12]  First, in calculating Kagy's

---

[12] A third factor, Kagy's experience, reputation and ability, is implicated by the facts of this case.  However, the Court will not consider Kagy's experience, including her LL.M. course work and participation in the *Princz* case, in setting her reasonable hourly rate because of the arguably excessive amount of background research that she believed was necessary in preparation for drafting the *Ex Parte* Brief.  The Third Circuit has warned District Courts to be wary of such "double dipping," and has stated that "[a] fee applicant cannot demand a high hourly rate - which is based on his or her experience, reputation, and a presumed familiarity with the applicable law - and then run up an inordinate amount of time researching that same law."  *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983).

reasonably hourly rate an enhancement for time and labor required is appropriate.  Kagy worked

on *Flatow* from November 1997 until January 2000.  During that time she participated in all

phases of the case and was the member of the *Flatow* team primarily responsible for legal

research and drafting briefs that were filed both in this District and throughout the country.

Second, Kagy's reasonable hourly rate must reflect the skill that was required to perform the

legal services in *Flatow* and *Eisenfeld*.  The work product that Kagy produced in *Flatow* and that

was admitted into evidence during the trial demonstrate that she is an excellent legal writer.

Additionally, Fay testified that Kagy was "an excellent writer" and "a hard worker" and that she

provided good legal analysis.  (Tr. I at 52-53.)  During the *Flatow* case, Fay even introduced

Kagy to Judge Lamberth as being "the brains of the operation."  (Tr. I at 44.)

　　　　After considering the *Laffey* Matrix and the relevant *Johnson* factors, the Court concludes

that $150 per hour - the floor set by the Court of Appeals - is a reasonable hourly rate at which

Kagy should be paid for her work on *Flatow* and *Eisenfeld*.  Multiplied by the number of hours

that Kagy reasonably worked, the lodestar figures are $288,832.50 for the *Flatow* case and

$25,084.50 for the *Eisenfeld* case.

　　　　　　　　3.　　　*Adjustment to the Lodestar*

　　　　A court may adjust the lodestar figure upward based on the circumstances of the case.

*Copeland*, 641 F.2d at 893.  In doing so, many courts use the factors set forth in *Johnson* and

discussed above.  *Hensley*, 461 U.S. at 434.  However, if the court has chosen to use these factors

in its initial calculation of an attorney's reasonable hourly rate, it would not be appropriate to

apply them a second time to adjust the lodestar.  *See id.* at 434 n.9 (noting that many of the

*Johnson* "factors usually are subsumed within the initial calculation of hours reasonably

expended at a reasonable hourly rate").  Additionally, the D.C. Circuit has warned that "[t]he use

of multipliers for exceptional cases, attorneys and results, etc., . . . is not countenanced in most

cases and a party's recovery is typically limited to a reasonable lodestar figure."  *In re Olson* 884

F.2d at 1423.  Because this Court has already used two of the *Johnson* factors in calculating

Kagy's reasonable hourly rate and cannot find any other relevant factors that would justify an

upward adjustment or the application of a  multiplier, the Court concludes that there is no basis

in District of Columbia law for increasing Kagy's reasonable hourly rate above the $150 floor set

by the Court of Appeals.

　　　　While an upward adjustment is not warranted in this case, a downward adjustment is.  An

attorney's fee award may also be adjusted downward if the attorney is seeking compensation for

activities typically performed by a paralegal or law clerk.  The United States Court of Appeals for

the Fifth Circuit has held that a court analyzing a claim for attorney's fees must:

> distinguish between legal work, in the strict sense, and investigation, clerical
> work, compilation of facts and statistics, and other work which can often be
> accomplished by non-lawyers but which a lawyer may do because he has no other
> help available.  Such non-legal work may command a lesser rate.  Its dollar value
> is not enhanced just because a lawyer does it.

*Johnson* 488 F.2d at 717.  *See also Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir.

2001) (finding that it is unreasonable for an attorney to be compensated at the same rate for tasks

that are generally performed by paralegal or secretaries as he is for legal work).  *Ginberg v.

Tauber* demonstrates the application of downward adjustment for non-legal work in the context

of a *quantum meruit* claim.  In that case, the trial court applied the lodestar formula to determine

a fee award in an attorney-client dispute and then applied a "fifteen-percent downward

adjustment for the routine performance of non-attorney 'ministerial' duties."  678 A.2d at 547

n.5.

In addition to conducting legal research and drafting briefs, Kagy also performed many tasks in the *Flatow* case that would normally be performed by a secretary or paralegal. Kagy assembled press packets, spent hours at the photocopying machine, arranged to have documents translated into Farsi and Hebrew, and brought numerous documents to the courthouse for filing. (*See, e.g.,* Tr. II at 87-89; Tr. IV at 48-49.) The Court does not doubt that these were crucial tasks that furthered the *Flatow* litigation, especially considering that Perles did not employ any support staff, but the Court does not believe that Kagy should be compensated for these activities at the same rate she is compensated for her legal work. Therefore, in accordance with *Ginberg* and the other cases discussed above, the Court will apply a 10% downward adjustment to the lodestar figure for the *Flatow* case. As a result, Kagy is entitled to equitable compensation totaling $285,033.75, representing $259,949.25 for her services in *Flatow* and $25,084.50 for her services in *Eisenfeld.*

B.    Availability of Prejudgment Interest

District of Columbia[13] law provides:

> In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only. This section does not preclude the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. In an action to recover damages for a wrong the judgment for the plaintiff shall bear interest.

D.C. CODE § 15-109. Although this statute refers to the availability of interest in a breach of

---

[13] Because the availability of prejudgment interest is a substantive matter, this Court must apply District of Columbia law. *Burlington Ins. Co. v. Okie Dokie, Inc.*, 398 F.Supp.2d 147, 158 (D.D.C. 2005).

contract action, interest may be awarded in cases where no clear contractual relationship exists. *House of Wines, Inc. v. Sumter*, 510 A.2d 492, 499 (D.C. 1986). An award of prejudgment interest is not mandatory in cases where the claim is unliquidated, such as a *quantum meruit* action. *Fed. Mktg. Co. v. Va. Impression Prods. Co.*, 823 A.2d 513, 530 (D.C. 2003); *District of Columbia v. Campbell*, 580 A.2d 1295, 1301 (D.C. 1990) (claims based on *quantum meruit* "are by their very nature unliquidated"). However, the D.C. Court of Appeals has maintained that whether the debt is liquidated is less important than "whether the plaintiff has been deprived of the use of the money withheld and should be compensated for the loss." *District of Columbia v. Pierce*, 527 A.2d 306, 311 (D.C. 1987). Overall, the Court has broad discretion to include prejudgment interest in its damages award if it is necessary to fully compensate the creditor party. *Fed. Mktg. Co.*, 823 A.2d at 513.

In the present case, equity requires that this Court exercise its discretion and award Kagy some measure of prejudgment interest in addition to the equitable compensation discussed above. It is undisputed that Kagy was never paid for work that she performed on the *Flatow* and *Eisenfeld* cases. (Statement of Stipulated Facts ¶ 17.) Therefore from January 2001 - the time at which the compensatory portions of the *Flatow* and *Eisenfeld* judgments were released to Perles - until the present (*Id.* ¶ 18), Kagy has been deprived the use of her attorney's fees. While Perles argues that Kagy is not entitled to prejudgment interest because she failed to prove that the delay in payment was attributable to Perles (*see* Pl.'s Proposed Findings of Fact & Conclusions of Law ¶ 22), the Court refuses to place blame squarely on the shoulders of either party. Instead, the Court merely concludes that prejudgment interest is required to fully compensate Kagy and make her whole.

_____The remaining issue is the interest rate to be applied.  From January 31, 2001 until the present, the funds that will be used to satisfy a judgment in favor of Kagy were held in various accounts, with interest rates ranging from 1.0% to 4.5%.  (Supplement [163].)  In calculating the measure of prejudgment interest to which Kagy is entitled, the Court will use the average interest rate that the deposited funds earned during this period.  Utilizing a formula that takes into account the length of time that the funds were subject to each interest rate, the Court finds that the average interest rate is 2.38%.[14]  Applying this rate to the judgment amount of $285,033.75 determined above, the Court concludes that Kagy is entitled to $6,783.80 in prejudgment interest.

IV.     **CONCLUSION**

For the foregoing reasons, it is this 13th day of November, 2007 hereby

**ORDERED** that Steven Perles pay Anne-Marie Kagy $291,817.55, representing $285,033.75 in reasonable equitable compensation for her work on the *Flatow* and *Eisenfeld* cases plus $6,783.80 in pre-judgment interest; and it is further

**ORDERED** that after the judgment is paid, the balance of the funds remaining in escrow pursuant to this Court's order of September 12, 2007 [157] shall be released to Steven Perles.

_____/s/_____
ALAN KAY
UNITED STATES MAGISTRATE JUDGE

_____

[14] The Court took the data set forth in Perles's Supplement to Findings of Fact and Conclusions of Law [163] and calculated prejudgment interest using the following formula:

[(2.6%)(242 days) + (2.0%)(61 days) + (1.5%)(365 days) + (1.5%)(304 days) + (1.0%)(366 days) + (1.0%)(83 days) + (1.35%)(59 days) + (1.45%)(31 days) + (1.53%)(30 days) + (1.6%)(31 days) + (1.68%)(30 days) + (1.76%)(31 days) + (1.84%)(31 days) + (4.1%)(761 days) + (2.45%)(8 days) + (4.5%)(34 days)] / 2467 days = 2.38%

# APPENDIX A

**Raw Number of Hours Expended by Kagy in *Flatow***

| DATE | ACTIVITY | HOURS |
|---|---|---|
| November 8, 1996 | Memorandum on potential defendants | 2 |
| December 1996 | Meeting with *Flatow* team | 4 |
| December 1996-February 1997 | Drafting and editing Complaint | 50 |
| February 25-26, 1997 | Activities related to filing Complaint | 20 |
| February 1997 | Case summary | 4 |
| January-February 1997 | Legislative work | 40-50 |
| February 1997 | Executive branch communications | 10 |
| February 1997 | Team letters | 2 |
| March 3, 1997 | Motion to Recuse Judge Lamberth | 5 |
| March 4, 1997 | Corrections to Motion to Recuse | 2 |
| March 1997 | Media relations and correspondence | 40 |
| March-June 1997 | Service of process (three stages) | 45 |
| April 16, 1997 | Discussion of denial of Motion to Recuse | 1 |
| May 1997 | Status report on service of process | 6 |
| September 3, 1997 | Motion for Entry of Default | 30 |
| September 1997 | Service of Notice of Default | 10 |
| June-August 1997 | Research for *Ex Parte* Brief | 100-200 |
| August-November 1997 | Drafting and filing *Ex Parte* Brief | 1010 |
| November 18, 1997 | Notice of Supplemental Authority | 6 |
| November 1997 | Assistance with Perles' Israel trip | 10-15 |
| December 1, 1997 | Status conference with Judge Lamberth | 5 |
| December 1, 1997-January 1, 1998 | Proposed FFCL (pre-trial version) | 100 |
| January 1998 | Request for int'l judicial assistance | 20-25 |
| January-February 1998 | Trial preparation | 80-120 |
| February 1998 | Assistance with Fay's Israel trip | 5 |
| February 1998 | Damages and solatium memoranda | 50 |
| February 24, 1998 | Affidavit of Stephen Flatow | 4 |
| March 2-3, 1998 | *Flatow* Hearing | 20 |
| March 1998 | Draft closing argument | 10 |

| March 1998 | Proposed FFCL II (post-trial) | 25-28 |
|---|---|---|
| March 1998 | Judgment-related activities | 30 |
| March 9, 1998 | Brief on collateral attacks | 15 |
| March 20, 1998 | Enforcement memorandum | 28-30 |
| April 1998 | Response to letter from attorney | 2 |
| June 11, 1998 | Memorandum on procedural issues | 5 |
| July 1998 | Motion re: U.S. opposition to attachment | 5 |
| July 7, 1998 | Hearing on U.S. Motion to Stay | 6 |
| July 24, 1998 | Memorandum on Statement of Interest | 10 |
| July 1998 | Hearing (U.S. Entry of Appearance) | 5 |
| July-August 1998 | Response to U.S. Statement of Interest | 100 |
| November 1998 | Brief on Change in Applicable Law | 100 |
| November 14, 1998 | International Law Weekend | 16 |
| December 1998 | Response to Alavi Foundation's Motion to Quash (MD) | 140-160 |
| December 1998 | Opposition to U.S. Motion to Quash (*Avco*) | 50 |
| December 30, 1998 | Reply to US Reponse in Nations Bank | 10 |
| January-March 1999 | Trial Lawyers Award information | 60 |
| February 1999 | Response to Alavi Foundation's Motion to Quash (TX) | 40 |
| March 1999 | Motion to Intervene in *Cubic* (SD Cal.) | 30 |
| March 1999 | Drafting article for publication | 40 |
| April 1999 | Letter to Congress | 5 |
| April-May 1999 | Preparing Perles for Alavi hearing in MD | 70-80 |
| October 28, 1999 | Notice of pending legislation | 5 |
| November-December 1999 | Opposition to Bank Saderat's Motion | 40 |
| December 1999 | Cubic Enforcement Proceeding (9th Cir.) | 5 |
| December 1999-January 2000 | Alavi 4th Cir. brief and travel to Richmond | 25 |
| | **TOTAL: 2558-2753** | |